UNITED STATES of America, Plaintiff–Appellee,

v.

Dashielle BLACKWELL and David Harvey, Defendants–Appellants.

Nos. 94–1404, 94–2118.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1994.

Decided March 1, 1995.

Chris R. Larsen, Asst. U.S. Atty. (argued), Milwaukee, WI, for plaintiff-appellee.

James J. Mathie (argued), Mitchell, Baxter, O'Meara & Mathie, Milwaukee, WI, for defendant-appellant.

Before CUDAHY, COFFIN * and ROUNER, Circuit Judges.

COFFIN, Circuit Judge.

Appellants Dashielle Blackwell and David Harvey were charged with conspiring to defraud banks and merchants by "kiting" checks they knew to be stolen, forged or otherwise not backed by sufficient funds.

---

\* The Honorable Frank M. Coffin of the First Circuit is sitting by designation.

Both men pled guilty to one count of conspiracy to commit bank fraud and to possess stolen mail. Each now claims that the district court erred in sentencing. We affirm the term imposed on Blackwell, but conclude that Harvey must be resentenced.

## I. *Background*

As described in their Presentence Investigation Reports ("PSI" or "presentence report"),[1] the defendants and a number of cohorts employed a variety of techniques to defraud banks and merchants by using phony or stolen checks. In one typical scenario, the defendants would open accounts in false names, deposit stolen, forged or bad checks into the accounts, and withdraw cash from an automated teller machine before the banks realized the deposits were faulty. The defendants also wrote checks backed by insufficient funds to local merchants. The government developed documentary evidence of approximately $180,000 in losses resulting from the defendants' unlawful activities, which took place in several different states.

The appellants were sentenced separately. The court imposed a 21–month prison term on Blackwell and ordered him to pay restitution in the amount of $179,721.60. Harvey was sentenced to a 40–month term and assessed the same amount of restitution. Each defendant raises different claims of sentencing error. We address them seriatim.

## II. *Blackwell's Appeal*

■ Blackwell asserts that the district court erred (1) in allowing a document containing hearsay into evidence at the sentencing hearing, and (2) in calculating the amount of loss properly attributable to him.

Both claims may be dispatched easily. First, the challenged document was introduced in conjunction with the testimony of Postal Inspector Mike Cashmer. Entitled "Request for Laboratory Examination," it contained handwritten circles around certain numbers on an itemized list. Cashmer stated that the items with circles, mostly checks or deposit slips, had been identified by the

crime lab as containing Blackwell's fingerprints.

Blackwell's counsel objected to the document's admission, claiming that the government had presented no evidence that the document was reliable and, indeed, had not even identified the person who made the circles. The court nonetheless accepted the document into evidence, and implicitly relied upon it in determining that Blackwell's participation in the conspiracy was extensive.

We find no abuse of discretion in the court's action. As Blackwell recognizes, "there is little limit on the type of information the district court can consider in sentencing," *United States v. Marshall*, 719 F.2d 887, 891 (7th Cir.1983). So long as a defendant has an opportunity to rebut evidence that he believes is erroneous, a district court generally is not precluded from relying on hearsay in sentencing. *Id.; see also United States v. Helton*, 975 F.2d 430, 434 (7th Cir. 1992); *United States v. Cusenza*, 749 F.2d 473, 478 (7th Cir.1984).

Defense counsel had the opportunity at the hearing to cross-examine Cashmer and thus to challenge the accuracy of the inspector's representation that the circles identified items containing Blackwell's fingerprints. Counsel made no effort to do this. We consequently cannot fault the district court's consideration of the document.

■ Blackwell's second contention is equally insubstantial. His presentence report contained attachments listing all fraudulent or "non-sufficient funds" checks identified by the government during the investigation. Blackwell did not object below to the total loss figure that was calculated based on these attachments, and he therefore may not now challenge the calculation. *See United States v. Strauser*, 21 F.3d 194, 197 (7th Cir.1994).

■ His effort to distance himself from some of the transactions, while preserved, fares no better. Guideline § 1B1.3(a)(1)(B) directs the sentencing court to consider, in

---

1. The record on appeal actually includes only Harvey's report. Because that report covers the conduct of all of the defendants, we assume that each of their PSIs contains the same summary of the offense.

the case of a jointly undertaken criminal activity, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *United States v. Colello*, 16 F.3d 193, 197 (7th Cir. 1994). The district court's factual finding that the total fraud amount was "reasonably foreseeable" must be upheld absent clear error. *United States v. Rosa*, 946 F.2d 505, 508 (7th Cir.1991).

■ We find no such error. Through the "Request for Laboratory Examination," the government linked Blackwell to approximately $64,000 in losses—nearly one-third of the total amount attributed to the conspiracy. In addition, the court heard testimony from both the government and Blackwell about his efforts to assist others during the conspiracy, and his joint access to a box containing checks used by the conspirators. In these circumstances, the court properly concluded that Blackwell was aware of the broad scope of the check-kiting scheme, and reasonably should have anticipated losses resulting from the activities of other participants. He need not have had specific knowledge of each of the other transactions to be held responsible for them. *See United States v. Flores*, 5 F.3d 1070, 1083 (7th Cir.1993).

### III. *Harvey's Appeal*

Harvey also asserts two sentencing errors: (1) that the court improperly considered testimony from codefendants' sentencing hearings in finding that he played a leadership role in the conspiracy, and (2) that the court abused its discretion in refusing to give him credit for 14 months of incarceration previously served for conduct related to the present offense.

Both of these issues warrant somewhat extended consideration.

#### A. *Reliance on testimony from co-defendants' sentencing*

Harvey's presentence report recommended a three-level increase in his base offense level, under Guideline § 3B1.1(b), to reflect a supervisory role in the conspiracy. Although the government initially supported this recommendation, by the time of Harvey's sen-

tencing hearing the prosecutor had concluded that such an increase would be inappropriate and declined to call witnesses on that issue. The prosecutor explained at the hearing that the change in position stemmed primarily from the result of Blackwell's sentencing, where the court found, based on similar facts, that there was insufficient evidence to support a role increase.

The court, however, evidently believed that the testimony presented at the other defendants' hearings, all of which took place before Harvey's, identified Harvey as the primary force behind the conspiracy. Thus, despite lengthy discussion in which both the prosecutor and defense attorney characterized the conspirators as a loosely knit group who sometimes helped each other and discussed their activities, without a real leader, the court imposed a two-level increase based on its belief that Harvey played a relatively more pivotal role in the conspiracy.

No evidence was presented at the hearing, which consisted almost entirely of colloquy between the court and the two lawyers. The probation officer, in response to a question from the court, did briefly relate conversations she had had with two codefendants concerning Harvey's role. *See* n. 6 *infra.* Harvey also made a statement after the court announced its finding on the role issue, but before formal imposition of sentence.

■ On appeal, Harvey argues that the district court's reliance on testimony from hearings that neither he nor his lawyer attended denied him a fair sentencing by depriving him of a meaningful opportunity to challenge the evidence against him. He therefore asserts that the case must be remanded for a new hearing and resentencing.

■ It is well established that a convicted defendant has the right to be sentenced on the basis of accurate and reliable information, and that implicit in this right is the opportunity to rebut the government's evidence and the information in the presentence report. *See United States v. Agyemang*, 876 F.2d 1264, 1270 (7th Cir.1989). The Supreme Court has emphasized that Fed. R.Crim.P. 32 "contemplates full adversary testing of the issues relevant to a Guidelines

sentence and mandates that the parties be given 'an opportunity to comment upon the probation officer's determination and on other matters relating to the appropriate sentence.'" *Burns v. United States,* 501 U.S. 129, 135, 111 S.Ct. 2182, 2186, 115 L.Ed.2d 123 (1991) (quoting Fed.R.Crim.P. 32(a)(1)).[2]

As discussed earlier, however, *see supra* at 1234, a trial judge has wide discretion in the matters it may consider when imposing sentence, and more than one circuit has condoned reliance on evidence from related trial proceedings of codefendants. *See United States v. Berzon,* 941 F.2d 8, 19 (1st Cir. 1991); *United States v. Pimentel,* 932 F.2d 1029, 1032 (2d Cir.1991); *United States v. Notrangelo,* 909 F.2d 363, 365 (9th Cir.1990); *United States v. Castellanos,* 904 F.2d 1490, 1495–96 (11th Cir.1990). As with any other sentencing information, the court simply is obligated to give the defendant an opportunity to rebut such evidence.

In seeking a remand, Harvey relies heavily on the First Circuit's decision in *Berzon,* whose facts closely resemble the facts of this case. At issue there was the testimony of a Drug Enforcement Administration Special Agent, who commented on defendant Berzon's role in a narcotics ring in the course of testifying at a codefendant's prior sentencing hearing. On appeal, Berzon's attorney stated that he first learned of the earlier testimony *after* Berzon's hearing, apparently upon inquiry triggered by his surprise that the court had found Berzon to be a leader or organizer without testimony from that agent.

The First Circuit remanded for review of Berzon's sentencing because the previously undisclosed testimony included significant, unfavorable statements bearing on Berzon's role in the offense.[3] Failing to provide a defendant with notice that such information would be considered, the court ruled, was tantamount to depriving him of his opportunity to respond to it, since "'[t]h[e] right to

be heard has little reality or worth unless one is informed,'" *id.* at 18 (quoting *Burns,* 501 U.S. at 135–37, 111 S.Ct. at 2186 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 94 L.Ed. 865 (1950))). The appeals panel directed district courts to alert defendants in advance if they anticipate considering extra-record materials in imposing sentence.

In finding that remand was necessary, however, the panel carefully distinguished Berzon's case from others in which courts had found no error, such as *Notrangelo* and *Pimentel.* In those cases, the First Circuit pointed out, the sentencing judge's reliance on a codefendant's proceeding was proper because the same facts adduced through testimony had been included in the defendant's presentence report. 941 F.2d at 19–20. The court noted:

> We agree entirely with the results in those cases. The difficulty here, by way of contrast, is that the testimony and argument at [the codefendant's] sentencing included information *not* in the PSI nor otherwise in the record in Berzon's case.

*Id.* (emphasis in original).

In a slightly different setting, the Supreme Court reached the same conclusion about the importance of notice in the sentencing process. The case, *Burns v. United States,* involved a district court's *sua sponte* upward departure from the Guidelines at the conclusion of a sentencing hearing. The plea agreement in *Burns* had stated the parties' expectation that the defendant would be sentenced within the applicable Guidelines range, and the presentence report confirmed this expectation, concluding that there were no factors warranting departure.

Resolving a split in the circuits, the Court held that Rule 32 obliged the district court to furnish advance notice of its intent *sua sponte* to depart from the Guidelines. The

---

**2.** Fed.R.Crim.P. 32 was amended, effective December 1, 1994. The court's obligation to provide an opportunity for comment on matters related to the appropriate sentence is now contained in section (c)(1).

**3.** The First Circuit did not actually order resentencing because it was unclear whether the trial

judge had relied upon the challenged information in imposing sentence. The appeals court directed the trial judge, upon remand, to indicate in the record whether he materially relied upon the information in sentencing Berzon. Resentencing would be necessary only if the court indicated that it did so rely. 941 F.2d at 20.

Court pointed to § (a)(1) of the Rule, mandating an opportunity to comment on sentencing matters, and observed that a *sua sponte* departure from the Guidelines is "[o]bviously" a " 'matte[r] relating to the appropriate sentence.' " 501 U.S. at 135, 111 S.Ct. at 2186. It then went on:

In our view, it makes no sense to impute to Congress an intent that a defendant have the right *to comment* on the appropriateness of a *sua sponte* departure but not the right *to be notified* that the court is contemplating such a ruling.

*Id.* (emphasis in original). The Court therefore held that Rule 32 requires a court to provide specific notice of the ground on which it is contemplating a *sua sponte* upward departure. *Id.*, 501 U.S. at 137–39, 111 S.Ct. at 2187.

■ Harvey urges us to view this case as akin to *Berzon* and *Burns,* and to remand, because the district court gave no notice of its intention to rely on evidence presented at his codefendants' sentencing hearings. This is not enough, however, to establish error. As we have seen, the fairness of a sentencing turns not on whether the defendant had the same access as the court to all relevant information, but on whether the defendant had sufficient notice to permit a meaningful response to the information considered.

The fact that Harvey and his attorney were not present at the prior hearings is thus significant, but not dispositive of his claim.[4] The caselaw discussed above suggests to us a two-prong inquiry: first, was the specific evidence considered by the court from the prior sentencing hearings previously undisclosed to Harvey, and second, if he had no prior knowledge, was he given a reasonable opportunity to respond to the information.

In order to address the first issue, we have carefully compared Harvey's presentence report with the transcript of his sentencing hearing. We have found that, for the most part, the content of the testimony to which the district court made reference at Harvey's hearing was at least generally included in the

PSI. The district court's lengthy summary of his reasons for imposing a role-in-the-offense increase included the following statements:

[T]here was testimony [at Blackwell's sentencing] from other individuals [besides Blackwell], as well as Inspector Cashmere[sic], that Mr. Harvey did teach the game to the group ... and there was testimony from at least Terence Grimes that Mr. Harvey was getting a split of the accounts.

... The court finds that it is undisputed in the record that the box of checks and identification was kept by Mr. Harvey, and that the box was, at least for a part of the time during this conspiracy, kept in the trunk of Mr. Harvey's car.

In any event, the evidence clearly establishes to this court's satisfaction that Mr. Harvey was not only an active participant but was a leader. He played an active role in the recruitment of accomplices, and certainly the evidence is clear that he trained or taught others how to engage in this illegal activity, and it's hard for this court to believe that he would not have shared in some way from the benefits derived from that activity.

There is some evidence that proceeds were shared with this defendant, and that may or may not have been the arrangement with each of the codefendants. The record is not clear in that regard. But, it just defies the imagination to say that somebody is going out and recruit and train and provide the tools with which the scheme could be carried out without expecting and receiving a share in the fruits of the conspiracy.

... [T]he court feels that in this case while this defendant may not have directly controlled each of the codefendants, he did in the court's judgment place himself in a position where he was responsible for the offense insofar as the actions of these codefendants are concerned. And he was

---

4. Unlike in *Berzon,* where it was not clear whether the court had relied on the disputed evidence,

it is clear here that the court did rely on testimony from prior hearings.

... in a position where he controlled the tools of the trade, recruited the individuals, trained them, and that in the court's judgment is a key role in the commission of the offense.

Harvey Sentencing Hearing, Tr. at 27–31.

Harvey's PSI contained the following explanation for the recommendation that he and Blackwell receive three-level increases based on managerial or supervisory roles in the offense:

> David Harvey and Dashielle Blackwell were involved in training all of the code-fendants involved in the instant offense; providing false identification to them; and instructions on how to execute the bank fraud scheme. The evidence also suggests both Mr. Harvey and Mr. Blackwell received a percentage of proceeds from each fraud scheme executed.

PSI, at 18.

This paragraph is a concise summary of most of the same factors that led the court to make its finding. On the issue of profit-splitting, however—which the district court appeared to treat as significant, making repeated references to it—we believe there was a deficiency in what Harvey knew about the evidence available to the judge. Other than the general statement in the PSI about what the evidence "suggests," the 45–page report contained no reference to Harvey's receiving a split of the profits from transactions in which he did not participate.[5] Harvey specifically objected to this assertion in his response to the PSI, thereby imposing on the court the obligation either to resolve the dispute by making a finding on the issue, or to determine that a finding is unnecessary because "the controverted matter will not be taken into account in, or will not affect, sentencing," Fed.R.Crim.P. 32(c)(1).

At the hearing, the court seemed to find, although not expressly, that Harvey did receive a "split of the accounts," see supra at 1237–38, and reached this conclusion at least partially in reliance on Terence Grimes' testimony at Blackwell's hearing.[6] In our view, Grimes' specific testimony was different not merely in degree, but in kind from the vague assertion contained in the PSI.

Moreover, although not explicitly included in his summation, the district court earlier in the hearing referred to Inspector Cashmer's testimony at Blackwell's hearing supposedly describing Harvey as "the main man" in the conspiracy.[7] In fact, Cashmer's testimony was that Terence Grimes had stated that Harvey "was the main man as well as Dash [Blackwell]." See Blackwell's Sentencing Hearing, Tr. at 33. Upon further questioning at that hearing, Cashmer confirmed that Grimes also described others as being "main men," and that the label apparently referred to anyone involved in the conspiracy, not to who was directing it. See id. at 32–33. A specific assertion by Grimes that Harvey was the "main man" would have been significant new information, if accurate, and Harvey obviously had no notice of such an allegation.[8]

---

**5.** In an addendum to the PSI, which responded to Harvey's objections to the report, the probation officer stated that Harvey supplied stolen business checks and received a profit from them. The fact that, in effect, he was paid for items he provided for use in the fraud is meaningfully different from an assertion that he generally received a cut of the profits from fraud activities. See Addendum to Presentence Report, at 2..

In a subsequent Memorandum from the US Attorney's office to the probation officer, the prosecutor noted, in discussing the government's position on a role-in-the-offense increase, that despite statements from some witnesses "that Harvey received a percentage of certain proceeds of the fraud" and some other circumstantial evidence, "the government believes the evidence falls short of establishing that he played a supervisory role ... by a preponderance of the evidence." Again, no specific statement by any specific codefendant was identified.

**6.** At Harvey's hearing, in response to the court's question whether she had made "some further independent investigation," the probation officer reported conversations with Terence and George Grimes, in which both indicated that "Harvey would get half of whatever the checks were once they were cashed." Harvey Sentencing Hearing, Tr. at 25–26.

**7.** The court asked the AUSA, "Didn't Inspector Cashmere [sic] testify that Mr. Harvey was the main man?" The prosecutor responded, "That's true, that's true." See Harvey's Sentencing Hearing, Tr. at 14.

**8.** Two other relatively minor mistakes in the court's recollection also occurred at Harvey's sentencing. At one point, the court noted statements from Terence Grimes that Grimes' brother, George, had "slid over to Robert [a name

Having concluded that certain significant evidence taken into account by the district court was not disclosed to Harvey before the hearing, we must turn to the second prong of our inquiry and examine whether he was given a reasonable opportunity to respond to that evidence. In this respect, *Berzon* and *Burns* are distinguishable because both involved a total lack of notice before sentences were imposed. In *Berzon*, defense counsel did not discover the existence of the prior testimony until after his client's sentencing. In *Burns*, the presentence report confirmed the parties' agreement that a departure was unwarranted, and the court announced its decision to depart unexpectedly, at the conclusion of the sentencing hearing.

Here, the government initially supported the role increase, the probation department continued to maintain throughout the pre-hearing period that such an increase was appropriate, and the court engaged in a lengthy dialogue with both the prosecutor and defense counsel before imposing sentence. The defendant, in other words, was on notice of a dispute between himself and others and was given some opportunity to respond to the new evidence before he was sentenced. Arguably, had he been more prepared for the hearing, perhaps bringing witnesses to testify, he would have been in a position to offer evidence to rebut Grimes' statements.

On balance, however, we do not believe Harvey was given sufficient notice to allow him meaningfully to rebut the prior testimony. Because the government backed away from a role increase, Harvey knew that no new evidence would be introduced at the hearing to support such an increase.[9] Additionally, the PSI had dealt with the role-in-the-offense issue for both Blackwell and Harvey together, and he knew that the same judge had found the evidence insufficient to support such an increase for Blackwell. Therefore, despite the probation department's continued recommendation for an upward adjustment, Harvey had reason to expect the court to adopt the government's changed position. That prospect was made all the more likely by Harvey's agreement with the government that, rather than litigating the role increase, his "somewhat greater involvement" in the conspiracy would be reflected through holding him responsible, like Blackwell, for the entire amount of the loss. *See* Harvey's Sentencing Hearing, Tr. at 4.

Thus, when they arrived for the sentencing, Harvey and his attorney reasonably would not have anticipated the need for evidence to rebut new, damaging information, and they obviously did not suspect that the court and prosecutor would remember incorrectly Cashmer's testimony at Blackwell's hearing. Had he been on notice of the court's skepticism of the government's new position against a role increase, however, and the basis for that skepticism, Harvey in all likelihood would have approached the hearing in a much different fashion. Presumably, he would have sought transcripts from the prior hearings, and perhaps would have sought to call Grimes as a witness. Indeed, the prosecutor, too, undoubtedly would have

used by appellant]." *See* Harvey Hearing, Tr. at 13. At Blackwell's hearing, Inspector Cashmer testified that he understood the "slid over" terminology meant that there was a change in who got a split of George's proceeds. Blackwell Hearing, Tr. at 34–35. At Harvey's hearing, in response to the court's reference to the "sliding over," the prosecutor, Mr. Larsen, said he believed that Terence Grimes actually had stated that George slid over to Dashielle Blackwell *from* Harvey. *See* Harvey Hearing, Tr. at 13. In fact, the prosecutor was correct.

Additionally, the court indicated that it thought Blackwell had testified that he was provided certain stolen checks (the Ejimkoyne checks) from Robert. *See* Tr. at 15. Larsen said he could not recall, but then went on to say that "I believe

Blackwell may have said he got them from Harvey." *Id.* Blackwell actually testified that the checks came from Gregory Parks, that they went into "a box that we all had possessed," and that it was from the box that Blackwell had taken some of the checks. *See* Blackwell Hearing, Tr. at 46–47, 49. Blackwell's testimony does suggest, however, that Harvey was the one who placed the checks in the box. *See id.* at 47.

9. Indeed, the Eighth Circuit has stated that, if a defendant objects to a factual allegation relied upon in the PSI, and the court needs to make a finding as to the allegation, " 'the government *must introduce evidence* sufficient to convince the Court by a preponderance of the evidence that the fact in question exists,' " *United States v. Mahler*, 984 F.2d 899, 905–06 (8th Cir.1993) (quoting earlier cases) (emphasis in original).

been better prepared. *See* Tr. at 13–15.[10] We therefore conclude that Harvey did not receive sufficient notice, as required by Rule 32, so that he could comment meaningfully on the court's decision to impose a role increase.[11]

This conclusion does not fully resolve the matter. Once confronted with the new information, the logical step for Harvey would have been to request a continuance to enable him to prepare to respond.[12] And, although his attorney repeatedly pointed out to the court during the hearing that neither he nor his client was present for the codefendants' testimony, implying a limited ability to respond to what they had said, *see* Tr. at 16, 18, 23, he neither asked for a continuance nor lodged a specific objection to the court's decision to sentence Harvey based on that testimony.

One could thus make a non-frivolous argument that Harvey's claim to lack of adequate notice, while potent, nevertheless was waived. While recognizing the importance of an appellant's obligation to bring claims of error clearly and completely to the trial court's attention, we choose in this instance to err, if at all, in a direction that ensures the integrity of the sentencing process. No party came to this hearing prepared to advocate against the three-level increase recommended by the probation department and, as we have seen, that situation led to faulty and uncorrected recollections of the prior testimony. Additionally, in its summation on the role adjustment, the district court characterized the evidence as "limited," *see* Tr. at 30, and, seemingly as a consequence of that determination, chose to impose only a two-level increase rather than to adopt the three-level recommendation.[13] Finally, the contrary finding with respect to Blackwell, in the face of the government's stated belief that "we really don't think there's justification for having a different result between the two defendants," Tr. at 11, suggests a significant likelihood that the lack of notice and concomitant limited ability to respond affected Harvey's sentence. We therefore think it prudent, if not necessary, to remand this case for resentencing. *See United States v. Curran,* 926 F.2d 59, 63 (1st Cir.1991) (in sentencing, " 'it is of the utmost importance not only that justice be done but that it appear to be done' ").[14] *Cf. United States v. Patrick,* 988 F.2d 641, 647–49 (6th Cir.1993) (sentencing court's failure to provide advance notice of intention to rely on evidence adduced at codefendant's plea hearing constitutes harmless error).

## B. *Rejection of 14–month credit*

Harvey's second issue also is one on which he and the government, as well as the probation department, were in accord. The parties had agreed that Harvey should receive credit for 12 months served in the District of Kansas and two additional months

---

10. In response to questions from the court about Cashmer's and other testimony at Blackwell's hearing, AUSA Larsen indicated that he did not have his notes in front of him, and could not recall certain aspects of the testimony. *See* Tr. at 14, 15.

11. Our determination that Rule 32 provides the basis for Harvey's claim of inadequate notice is consistent with the Supreme Court's decision in *Burns, see* 501 U.S. at 137–39, 111 S.Ct. at 2187, and makes it unnecessary to consider separately whether a due process violation occurred. *See also Berzon,* 941 F.2d at 19 n. 17. We doubt that there was a denial of due process, however, in light of the notice that was afforded him.

12. We do recognize that, once the proceeding had begun and in light of the district court's aggressive handling of the matter, requesting a continuance to stop the hearing would have been a difficult action for Harvey's attorney to take.

13. We are not entirely clear as to the district court's rationale for imposing the lesser increase provided by § 3B1.1(c) instead of the higher increase of subsection (b). The distinction in the Guidelines for those two provisions seems to turn on the extent of the criminal enterprise and not on the strength of the leadership showing. The resort to the lower penalty reflects to us the court's recognition of the closeness of its finding.

14. In *Berzon,* the court initially remanded the case to the original judge for a statement as to whether he did or did not rely on the evidence from the codefendant's hearing. If so, the First Circuit directed that Berzon be resentenced by a different judge. We decline to require reassignment, in light of the original judge's unique knowledge of the case gleaned from the proceedings involving all of the other defendants. We thus leave to his discretion whether to pass the matter on to another judge.

served in state jurisdictions because the conduct punished by those sentences was part of the conspiracy charged in this case, and consequently was taken into account in establishing Harvey's base offense level. Both parties therefore urged a 14–month downward departure from the Guidelines sentence.

This request was derived from U.S.S.G. § 5G1.3, which provides that a term of imprisonment should be imposed to run concurrently when a defendant is serving an undischarged term of imprisonment for "offense(s) that have been fully taken into account in the determination of the offense level for the instant offense." In essence, this provision insures that a defendant is not penalized twice for the same conduct. It therefore provides that, when the conduct underlying the earlier conviction affects the sentence in the later case, the later sentence must run concurrently to the undischarged portion of the earlier sentence. Additionally, Application Note 2 to § 5G1.3 states that the court should adjust for any term of imprisonment *already served* as a result of the earlier conduct.[15]

Section 5G1.3 on its face does not apply to Harvey because, by the time of his sentencing in Milwaukee, he had completed his term for the related conduct in Kansas and therefore had no relevant "undischarged term of imprisonment."[16] The probation office in this case apparently recognized that the rationale underlying § 5G1.3—to avoid double punishment—nevertheless was applicable to a defendant like Harvey, who had fully discharged his prior term. It sought guidance from the Sentencing Commission, which suggested that a downward departure would be the appropriate way to recognize such a defendant's prior time in prison.

Despite the joint request, the district court declined to give Harvey the credit because, when he was arrested in Kansas, he had identified himself falsely. This misidentification caused him to be placed in a lower criminal history category under the Guidelines for that offense, which in all likelihood resulted in a lower sentence than he should have received.[17] When the court articulated this concern, the prosecutor explained that the length of the earlier term should make no difference in the present case because, even if Harvey had received a longer sentence in Kansas, any additional time served there would have been included in the parties' request for a downward departure. In other words, the prosecutor indicated, had he served an additional twelve months in Kansas, the proper departure request would have been for 26 months—the 14 months actually being requested *plus* the additional twelve. Thus, the total time served on the conduct, taking both prosecutions together, would be unaffected by Harvey's false identification.

■ The case law in this circuit clearly establishes that a district court's refusal to depart from the sentencing range determined by the Guidelines is discretionary and not subject to review. *See, e.g., United States v. Harris,* 994 F.2d 412, 414–15 (7th Cir.1993); *United States v. Poff,* 926 F.2d 588, 590–91 (7th Cir.1991) (en banc). Although language in two of our prior cases suggests that there may exist a narrow ex-

---

15. The example given in the Commentary to the section involves a defendant convicted of a federal offense charging the sale of 40 grams of cocaine. Under § 1B1.3 (Relevant Conduct), the defendant is held accountable for the sale of an additional 15 grams of cocaine that was part of the same course of conduct, and for which the defendant previously has been convicted and sentenced in state court (a nine-month sentence, six of which have been served by the time of the federal sentencing). The guideline range applicable for the 55 grams of cocaine is 10–16 months. The court decides that 13 months is the appropriate sentence. According to the Commentary, because the defendant already has served six months on the related state charge, "a sentence of seven months, imposed to run con-

currently with the remainder of the defendant's state sentence, achieves this result."

16. He is, in fact, still imprisoned because he is serving time on an escape charge. Because that sentence was not for related conduct, however, it does not trigger § 5G1.3.

17. He was sentenced to a twelve-month term, which was at the high end of the sentencing range for the criminal history category the court thought was applicable. The high end of the correct range was 24 months. We, of course, do not know whether the Kansas court would have imposed the highest sentence in the higher range.

ception to this rule anchored in § 5G1.3, *see United States v. Sarna,* 28 F.3d 657, 658–59 (7th Cir.1994); *United States v. Lechuga,* 975 F.2d 397, 400–01 (7th Cir.1992),[18] a downward departure was not actually at issue in either of those cases. Both defendants were serving undischarged sentences, which meant that any reduction in sentence linked to § 5G1.3 could be accomplished without a departure.[19] Consequently, neither *Lechuga* nor *Sarna* provided us with the opportunity to consider the interplay of the statement regarding downward departures with the jurisdictional rule foreclosing review of a district court's decision not to depart.

We recognize that distinguishing between two defendants merely by virtue of their sentencing dates appears contrary to the Guidelines "goal of eliminating unwarranted sentence disparities," *Lechuga,* 975 F.2d at 400.[20] The Sentencing Commission, as evidenced by its recommendation of a downward departure, seemingly also appreciates the illogic of this distinction. In light of the clear precedent, however, *see supra* at 1241–42, we must conclude that the district court's decision not to depart on that basis is, like any other refusal to depart, unreviewable.[21] *Cf. United States v. Ogg,* 992 F.2d 265, 266–67 (10th Cir.1993) (rejecting credit for com-

pleted state sentence because § 5G1.3(b) literally does not apply).

Although we may not directly review the district court's rejection of a departure, we do encourage the court upon remand to reconsider its decision. The district judge refused to depart downward here simply because Harvey received a lesser sentence than he should have received in Kansas, essentially offsetting the requested 14 months of credit with the extra year he thought Harvey was supposed to serve on the earlier charge. Because, as the prosecutor explained, any additional sentence in Kansas properly should have been added to his credit, the mistake in Kansas does not provide a basis for denying the departure here. Assuming Harvey would have been eligible for the 14–month credit if he still were serving the prior terms at issue, we think it would be fair and appropriate to deduct that amount from the new sentence imposed on the instant offense.

Accordingly, we affirm Blackwell's sentence, and remand Harvey's case to the district court for a new hearing and resentencing.

18. In *Lechuga,* we addressed the appropriate manner of sentencing under the Guidelines when, at separate trials, a defendant has been convicted of an underlying offense and of failure to appear for trial. We stated:

> When a defendant is convicted in separate trials of two crimes that would be grouped if they had been consolidated in a single trial, the second trial court should impose a total sentence commensurate with that which the defendant would have received had the offenses been grouped at a single trial. *This is so even if the second court must depart downward from the guidelines to achieve such a result.* This procedure accords with the sentencing guidelines' purpose "to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553.... Thus in the second trial, the district court must impose a total sentence equal to that which would have been imposed in a single trial. See U.S.S.G. § 5G1.3(b) and Commentary.

*Id.* at 400–01 (emphasis added). We repeated this holding in *Sarna,* 28 F.3d at 658–59.

19. The Commentary to § 5G1.3 indicates that the Sentencing Commission did not view appli-

cation of that provision to constitute a departure. After detailing the example described *supra* at n. 15, showing how that situation would warrant a seven-month sentence to run concurrently with the remainder of the defendant's state sentence, the Commentary states:

> For clarity, the court should note on the Judgment in a Criminal Case Order that the sentence imposed is not a departure from the guidelines because the defendant has been credited for guideline purposes under § 5G1.3(b) with six months served in state custody.

20. Indeed, it perhaps could be argued that applying the guideline to undischarged sentences but not to discharged sentences lacks a rational basis and therefore violates the Constitution. Harvey, however, has not made that argument here.

21. The court did not erroneously conclude that it lacked the authority to depart, which would have been a reviewable mistake of law. *See, e.g., United States v. Poff,* 926 F.2d 588, 591 (7th Cir.1991) (en banc).