**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Jorge SALINAS, Rudolpho Medrano, and Benito Salinas, Defendants– Appellants.**

**Nos. 95–1144, 95–1145 and 95–1195.**

United States Court of Appeals, Seventh Circuit.

Argued June 14, 1995.

Decided July 24, 1995.

---

**2.** *United States v. Jenkins,* 4 F.3d 1338, 1345 n. 8 (6th Cir.1993), *cert. denied,* —— U.S. ——, 114

S.Ct. 1547, 128 L.Ed.2d 197 (1994).

Robert Anderson, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Madison, WI, for plaintiff-appellee.

David G. Stokes (argued), Madison, WI, Morris D. Berman (argued), Giesen & Berman, Madison, WI, and Howard S. Goldman (argued), Madison, WI, for defendants-appellants.

Before COFFEY, MANION, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

This is a consolidated direct appeal of three defendants, all of whom pleaded guilty to a marijuana conspiracy. Jorge Salinas was sentenced to a 55–month term of imprisonment; Benito Salinas was sentenced to a 74–month term; and Rudolpho Medrano was sentenced to a 72–month term. The defendants challenge their sentences on a variety of grounds.

In February 1992, Steve Martin, a distributor of marijuana in Stevens Point, Wisconsin, began purchasing marijuana from Ray Sanchez. Martin learned that the Salinas brothers, Juan, Benito, and Jorge, were responsible for delivering the marijuana from Mexico to Wisconsin. Martin's home eventually became an off-loading point for the marijuana.

In April 1992, Juan Salinas solicited Carol Ayers to drive 30 pounds of marijuana from Texas to the home of Ray Sanchez in Bancroft, Wisconsin, where Sanchez and Juan Salinas unloaded the marijuana. Ayers received $3,000 for her services.

The next month, Ayers transported 20 pounds of marijuana from Texas to Wisconsin for a fee of $100 per pound of marijuana rather than a flat fee. This rate became the established rate of pay for subsequent conveyances. Ayers began travelling to Texas regularly to transport marijuana. She later reported to the police that between April 1992 and March 1993 she made at least thirteen round trips from Texas to Wisconsin, transporting a total of approximately 700 pounds of marijuana. She also reported that Jorge became involved in the conspiracy in approximately May 1992; Benito in September 1992; and Rudolpho Medrano in November 1992.

On April 10 or 11, 1993, Juan Salinas, Benito Salinas, Leticia Ortiz, and Arnoldo Aguirre checked into two rooms at the Comfort Suites motel in Stevens Point, Wisconsin under fictitious names. They received numerous visitors and made long distance calls, drawing the attention of motel personnel. The Stevens Point Police Department was contacted but by the time they arrived at the Comfort Suites motel the two rooms had been vacated. With the permission of the motel management, the police searched the rooms and seized slips of paper with columns labeled "owed" and "paid" and a small amount of marijuana. Records from the telephone company revealed several long-distance calls placed to suspected and known drug dealers in the Portage County, Wisconsin area.

The Stevens Point Police Department maintained a surveillance of the four individuals as they rented rooms at the Best Western Royale Hotel on April 12, 1993. The manager of the hotel was shown pictures from booking sheets and identified Leticia Ortiz, Arnoldo Aguirre, Juan Salinas, and Benito Salinas. The manager agreed to save the garbage from their rooms and turn it over to the police. The garbage consisted of notes containing names of known drug dealers and dollar amounts owed and received along with telephone numbers and amounts of marijuana delivered. Telephone records from the rooms revealed that several calls were made to Steve Martin and Ray Sanchez, both of whom were known by the police to be drug dealers.

On April 15, 1993, a state court judge issued search warrants for the Best Western rooms, leading to the discovery of over $8,000 in cash. Juan Salinas, Benito Salinas, Leticia Ortiz, and Arnoldo Aguirre were subsequently arrested. Found on Aguirre's person was $274.72 in cash, Florida business cards, and a copy of a Western Union money transfer receipt reflecting that Aguirre had sent $500 to Medrano from Stevens Point, Wisconsin, on April 8, 1993. Found on Benito Salinas' person were two envelopes containing a total of $828 in cash.

In late April 1993, Ayers contacted Medrano and made arrangements to transport marijuana from Texas to Florida. Ayers arrived

in Texas on April 29, 1993, and turned her vehicle over to Medrano. Medrano loaded the vehicle with marijuana and returned it to Ayers. Medrano instructed Ayers to drive to Lakeland, Florida, and contact "Eloy." Ayers arrived in Florida around May 7, 1993, and contacted Eloy, who unloaded the marijuana from her vehicle. Two days later, on May 9, 1993, Medrano met Ayers in Florida and paid her $10,000 for transporting the marijuana.

In June 1993, Ayers contacted law enforcement officers in Wisconsin and offered to cooperate in their investigation of the marijuana distribution network in Stevens Point. Ayers provided a summary of the number of times, the quantity, and the approximate dates when she delivered marijuana from Texas to Wisconsin for Juan Salinas and the other persons involved in the network. According to Ayers, Jorge Salinas joined the conspiracy in May 1992, while Benito Salinas joined in September 1992. Western Union money transfer records corroborated Ayers' statements about the timing of the Salinas brothers' involvement in the marijuana conspiracy.

In July 1993, Ayers received from Medrano and his girlfriend Martha Salinas[1] correspondence stating that they were "ready to go" and had "a lot of Mexican goods for [her] to sell." As part of her agreement with law enforcement, Ayers recorded telephone conversations between herself, Medrano, and Martha Salinas, who served as an interpreter for Medrano due to his poor English. Martha Salinas informed Ayers that she and Medrano wanted Ayers to make another trip and would send her money via a Western Union wire transfer to purchase a one-way airplane ticket from Missouri to Texas. In Texas, Ayers was instructed to drive a vehicle loaded with 40 pounds of marijuana back to Minnesota. On November 21, 1993, the trip was thwarted when the vehicle was searched and approximately forty pounds of marijuana were seized, resulting in Medrano's arrest. Jorge Salinas was arrested several months later when his car was stopped at a drug check point in Missouri and 50 pounds of marijuana were seized from the trunk of the car.

On May 11, 1994, a federal grand jury returned a two-count indictment against six defendants: Rudolpho Medrano, Juan Salinas, Benito Salinas, Jorge Salinas, Arnoldo Aguirre, and Martha Salinas. The first count of the indictment charged that Rudolpho Medrano, Juan Salinas, Benito Salinas, Jorge Salinas, Arnoldo Aguirre, and Martha Salinas knowingly and intentionally conspired to possess with the intent to distribute and to distribute marijuana[2] in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two of the indictment charged that during the same time period all of the defendants, with the exception of Martha Salinas, conspired to use a communication facility, namely Western Union Wire Transfer, to facilitate the marijuana conspiracy in violation of 21 U.S.C. § 843.

On November 10, 1994, Jorge Salinas, Benito Salinas, and Rudolpho Medrano pleaded guilty to Count One of the indictment. Count Two of the indictment was dismissed against each defendant pursuant to their respective plea bargains. The case was set for sentencing on January 12, 1995. At the sentencing hearing,[3] the district court imposed the following terms of imprisonment: 55 months for Jorge Salinas; 72 months for Rudolpho Medrano; and 74 months for Benito Salinas.[4] This appeal followed.

### Benito Salinas

 Benito Salinas challenges the sufficiency of the factual determinations made by the district court in regard to the amount of marijuana reasonably foreseeable to him for

---

1. Martha Salinas is not related to Juan, Benito, or Jorge Salinas.

2. The indictments state that the conspiracy ended in November 1993.

3. A joint sentencing hearing was held for Rudolpho Medrano, Jorge Salinas, Benito Salinas, Arnoldo Aguirre, and Martha Salinas. Juan Sali-

nas had been previously sentenced at a separate hearing.

4. This sentence was reduced by 16 months to take into account Benito Salinas' confinement in Wisconsin state custody for related criminal conduct pursuant to U.S.S.G. § 5G1.3(b).

sentencing purposes. The amount of drugs attributable to a conspirator is a factual determination which this court reviews for clear error. *United States v. Paters,* 16 F.3d 188, 191 (7th Cir.1994). A defendant has the due process right to be sentenced on the basis of accurate information. *United States v. Mustread,* 42 F.3d 1097, 1101 (7th Cir.1994). Each member of a conspiracy is accountable for the amount of drugs with which he was directly involved, and for amounts involved in transactions that were reasonably foreseeable. U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Garrett,* 45 F.3d 1135, 1141 (7th Cir.1995). The district court determines the quantity of drugs attributable to a defendant by a preponderance of the evidence, which we have found satisfies due process. *United States v. Ewers,* 54 F.3d 419 (7th Cir.1995); *United States v. Johnson,* 32 F.3d 265, 268 n. 1 (7th Cir.1994); *United States v. Trujillo,* 959 F.2d 1377, 1381 (7th Cir.1992). If the facts contained in the presentence report (PSR) bear sufficient indicia of reliability to support their probable accuracy, the court may take them into account in passing sentence. *United States v. Stephenson,* 53 F.3d 836 (7th Cir.1995).

 Benito Salinas generally complains that the district court offered nothing beyond a "boilerplate explanation." This argument has been waived, since it was not raised at the sentencing hearing. *United States v. Zarnes,* 33 F.3d 1454, 1475 (7th Cir.1994). Notwithstanding that waiver, the district court is permitted to adopt findings of fact and calculations found within the PSR as support for its findings and conclusions. *United States v. Kaufmann,* 985 F.2d 884, 899 (7th Cir.1993). Moreover, the district court's findings regarding the "part of this conspiracy into which Benito Salinas entered into," the amounts of marijuana set forth in "the table which has been the heart of the presentence report," and the testimony of Ohm as it related to Benito, were sufficient.

Benito points to the district court's reliance on hearsay supplied by Carol Ayers. He argues that the district court made "no findings as to why the hearsay presented by the government at the sentencing hearing should have been found reliable." Due process standards require that information used in sentencing have sufficient indicia of reliability. *United States v. Blackwell,* 49 F.3d 1232, 1235 (7th Cir.1995); *United States v. Lueddeke,* 908 F.2d 230, 234 (7th Cir.1990).

Benito joined the conspiracy in September 1992 and was arrested in April 1993. The court held him accountable for 325 to 345 pounds of marijuana. This amount was based on statements given by Carol Ayers and Steve Martin. Carol Ayers reported to Jim Ohm[5] that Benito was involved in four shipments. Martin's statements to Ohm corroborated Ayers' information.

| | | Ayers | Martin |
|---|---|---|---|
| 1. | September 1992 | 60–70 pounds | 40–60 pounds |
| 2. | November 1992 | 60–70 pounds | 40–60 pounds |
| 3. | February 1993 | 100 pounds | 90 pounds |
| 4. | March 1993 | 105 pounds | 105 pounds |
| | total: | 325 pounds | 275 pounds |

While Juan Salinas had earlier told the police that the loads were much less,[6] the district court was entitled to find this testimony not credible. The evidence more than adequately supports the drug quantity findings.

Benito also argues that his inability to cross-examine Ayers at the sentencing hearing violated his rights under the Confrontation Clause.[7] Benito cites *United States v. Corbin,* 998 F.2d 1377, 1385 n. 15 (7th Cir. 1993). Since *Corbin* was decided, however, this circuit has joined other circuits in finding that sentencing courts are allowed to use all relevant information without the strictures of the confrontation clause. *United States v. Francis,* 39 F.3d 803, 810 (7th Cir.1994); *United States v. Badger,* 983 F.2d 1443, 1459 (7th Cir.1993).

---

5. At the sentencing hearing, the district court heard the testimony of the primary case agent, Jim Ohm, of the Wisconsin Department of Justice, who had interviewed Carol Ayers and Steve Martin.

6. He stated that the loads were 20 pounds, 40 pounds, 30 pounds and 95 pounds, respectively.

7. The brief states: "Appellant's counsel believes that [this court] has not definitively determined what requirements the confrontation clause might impose on sentencing hearings."

### Jorge Salinas

Jorge Salinas challenges only the sufficiency of the reasons given to support the 55-month sentence imposed by the district court. He contends that the district court's failure to make specific factual findings when it imposed his sentence was clearly erroneous. The 1½ page argument is rather vague. Jorge Salinas asks this court to remand for a "proper findings of facts." He argues that the district court "failed to make the proper and complete findings as to the relevant facts that distinguish his case from his two co-defendant brothers and findings as to the law in the use of the federal sentencing guidelines." He adds that "the record does not indicate how or why the sentencing guidelines were applied or considered. . . . A declaration of a reason or reasons should have been made. . . ."

 Jorge Salinas did not object to the sufficiency of the court's factual findings at the sentencing hearing, and therefore the court need not address the issue. *United States v. Zarnes*, 33 F.3d at 1475. This is particularly true where there was no issue of disparity in sentencing raised either in the district court or in this court. Moreover, even if the issue of sufficiency of factual findings had been raised, the district court's "generic explanation of the amount of [drugs] reasonably foreseeable by [defendant] was supported by the collected evidence. . . ." *Id.* The court considered the fact that Jorge joined the conspiracy earlier than Benito.

"[H]is participation precedes even the introduction or entrance of Benito Salinas and Mr. Jorge Salinas continued as a member from that point—from the summer of 1992 onward whether or not he was present on those other two occasions that he disputes. And therefore the quantity of marijuana that he's going to be attributable with is at least the same, if not greater; in fact, greater because he was involved before Benito Salinas, than the quantity that Benito Salinas was involved with. But it will not in any event exceed 400 kilograms."

The court went on to discuss in detail the additional evidence of Jorge's involvement, including records of Western Union money transfers, which established that Jorge never withdrew from the conspiracy. The court held Jorge (like Benito) accountable for marijuana in the 100–400 kilogram range. As discussed above, the amount was determined from statements given by Carol Ayers and Steve Martin.

 The district court also noted at the joint sentencing hearing that the government need not repeat the same evidence, detailing the weight and off-loading of each shipment of marijuana as to each defendant. A sentencing court may use evidence presented at the sentencing hearings of coconspirators. *United States v. Blackwell*, 49 F.3d 1232, 1235–36 (7th Cir.1995) (collecting cases). The evidence taken into account by the district court must be disclosed to defendant prior to the sentencing hearing, and he must be given a reasonable opportunity to respond to that evidence. *Id.*

Here, the PSRs generally included the same information as that produced at Juan Salinas' sentencing hearing, particularly the chart relied upon by the district court. Moreover, there were no surprises; defendants knew exactly what the sentencing court would look to prior to the sentencing hearing. Even after all the information was disclosed, no objection was made at the sentencing hearing; therefore, defendants had the opportunity to respond, but failed to do so. *Cf. Blackwell*, 49 F.3d at 1239 (information was not adequately disclosed to defendant, and defendant was not given sufficient notice to allow him meaningfully to rebut the prior testimony).

Most significantly, even if Jorge was only aware of two shipments, not five, and could not have reasonably foreseen the others, he still falls within the 100–400 kilogram range for sentencing purposes. The district court's findings were sufficiently supported by the testimony presented at the joint sentencing hearing, and by the individual PSR detailing Jorge's involvement in the conspiracy.

### Rudolpho Medrano

Medrano, characterizing his involvement as minor, an unimportant cog in a much larger wheel, challenges the district court's

finding that he was an organizer or supervisor under U.S.S.G. § 3B1.1(c).[8]

The determination of what role a defendant played in a criminal enterprise is a question of fact, *United States v. Golden*, 954 F.2d 1413, 1418 (7th Cir.1992), and will not be disturbed absent clear error, *United States v. Cotts*, 14 F.3d 300, 308 (7th Cir. 1994). The district court's sentencing determinations are clearly erroneous only if, after considering all the evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been committed." *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989), quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

In April 1993, Medrano directed Ayers in a trip to transport marijuana to Florida. Ayers drove to Texas, where Medrano waited, turned her vehicle over to Medrano, waited while it was loaded with marijuana, and .then drove to Florida. Medrano instructed Ayers to contact "Eloy," which she did. Medrano travelled to Florida separately and on May 9, 1993, he paid Ayers $10,000 for transporting the marijuana.

In June 1993, Ayers began cooperating with law enforcement investigators. On July 19, 1993, Medrano wrote a letter to Carol Ayers declaring that they were "ready to go." Medrano instructed Ayers to contact him. A week later, on July 25, 1993, Medrano instructed his girl friend, Martha Salinas, to write to Ayers and. instruct her to call or write as "we have a lot of Mexican goods for you to sell." A recorded telephone conversation between Medrano and Ayers, with Martha Salinas on the line acting as an interpreter,[9] involved instructions that Ayers make another trip.[10] Ayers was told to pick up money via Western Union, use it to buy an airline ticket, and travel from Kansas City to Texas, where she would pick up 40 pounds of marijuana to take to Minnesota. When Ayers arrived in Texas, Medrano was arrested. Inside his car was 40 pounds of marijuana.

Further support for a finding that Medrano operated from a position where he exercised supervisory capacity, is found in the control he had over the conspiracy's money. Moreover, when Aguirre was arrested on April 15, 1993, he was in possession of a receipt indicating he had sent Medrano $500 on April 8, 1993. Also, he was riding in a car that belonged to Medrano. Evidence also indicated that on April 14, 1993, two wire transfers of $1,000 were sent to Medrano. Medrano himself provided or corroborated much of this information in his PSR. The evidence strongly supports a finding that Medrano had a significant degree of control and authority which he exercised over Ayers.

In an effort to point to Juan Salinas as the sole supervisor in the conspiratorial organization, Medrano relies heavily on a statement made by Ayers to Special Agent Ohm:

> "Johnny [Juan Salinas] had called me and told me to call Rudy [Medrano] and ah, *he would set up a trip for me* and they were gonna use some of this money for Salina's [sic] bail and lawyers and things." (Emphasis added.)

This statement does not favor Medrano's position. The fact that Juan trusted Medrano to handle "set[ting] up a trip" is only further evidence of his managerial level of responsibility within the structure of the conspiracy. The statement shows that Juan had delegated the planning and decision-making authority to Medrano for that trip.

Medrano heavily relies on the argument that he was present only during the latter

---

8. Medrano's sentence was enhanced two levels under this provision. It was then reduced three levels for acceptance of responsibility. He fell within the sentencing range of 70 to 87 months, and the district court sentenced him to 72 months' imprisonment. At sentencing, Medrano withdrew his challenge to the quantity of marijuana attributable to him.

9. Medrano's English was apparently poor, and Martha would from time to time act as an interpreter for him.

10. During the period of October 11, 1993 to November 18, 1993, Ayers and Martha Salinas spoke on the telephone at least 8 times; Medrano took part in at least one conversation. ("As to the rest, he was present and participated through Martha Salinas acting as his translator." (Medrano's brief, p. 15).) In one of these conversations, Martha and Medrano asked Ayers to make another trip, and told her they would wire money to her.

part of the conspiracy, and that "Ayers had participated in the conspiracy for a longer period of time than had Medrano."

The amount of time Medrano occupied the position of organizer or manager does not alter the fact that he held that position. This is true whether he was a manager for eight of the months (March 1993 to November 1993) in a 21–month conspiracy (February 1992 to November 1993), or for a single day at the beginning, middle, or end of the conspiracy. Medrano's lack of participation in the conspiracy's 12 transactions between April 1992 and March 1993 is of little relevance under the facts presented here. A leader need not occupy a permanent hierarchical relationship with others in the organization. He may organize others for only portions of the conspiracy. A finding that a defendant played a managerial or supervisory role in the offense is not precluded by the fact that the defendant's "tenure in the conspiracy may have been relatively short." *United States v. Dillard,* 43 F.3d 299, 307 (7th Cir.1994).

But Medrano insists that the fact that Juan Salinas was "in charge of the distribution network" precluded Medrano from being a supervisor or manager and that he, Ayers and Martha Salinas "occupied the lowest rung of the conspiracy."[11] This argument is not persuasive, because "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, comment n. 3. Thus, co-defendants can both qualify as organizers within the meaning of Guidelines § 3B1.1(c). *United States v. Golden,* 954 F.2d at 1419, citing *United States v. Ramos,* 932 F.2d 611, 619 (7th Cir.1991). These leaders may play differing supervisory or managerial roles in the criminal enterprise. *Id. See also United States v. Varela,* 993 F.2d 686, 691 (9th Cir. 1993); *United States v. Smith,* 924 F.2d 889, 895 (9th Cir.1991).

In addition, instead of undermining the finding of manager, the timing of the commencement of Medrano's managerial duties supports the finding, because the need for Medrano's services increased when Juan Salinas was arrested a few weeks after Medrano stepped onto the scene. Before that, Juan Salinas had been paying Ayers for her transporting services.

Medrano also offers the weak argument that before the Florida trip, it was Ayers who initiated a telephone call to Medrano. Absolutely nothing in the record indicates that Ayers was setting up the drug deals; she only telephoned someone in the conspiracy when directed to do so, for example when Medrano wrote her a letter instructing her to call him.

Medrano also relies on the fact that before the Minnesota trip, it was Martha Salinas—not Medrano—who instructed Ayers to destroy the wire transfer receipts because Aguirre had been caught with a receipt when he was arrested. Because Martha was acting as Medrano's translator in many of those conversations, the fact that an instruction (particularly one that would protect Medrano, since it was Medrano's name on the receipt found in Aguirre's possession) was relayed through Martha is of no consequence in determining whether Medrano was a supervisor under the Guidelines.

Medrano's reliance on *United States v. Guyton,* 36 F.3d 655 (7th Cir.1994), is to no avail, since that case narrowly addressed the question of whether the defendant had exercised control over more than two members of the conspiracy, since U.S.S.G. § 3B1.1(a) requires control over at least four participants. That subsection is not relevant in this case, since Medrano qualified as a "manager" under § 3B1.1(b), which does not require control over a specific number of participants. *See United States v. McGuire,* 957 F.2d 310, 316 (7th Cir.1992).

The district court did not commit clear error in finding that Medrano's sentence should be enhanced under U.S.S.G. § 3B1.1(c) for an aggravating role as an organizer or manager.

---

**11.** He also argues that "personnel came and went," but "[t]here was but one organizer in this crime." (Medrano brief, p. 16.)

The judgments of the district court are AFFIRMED as to all three defendants.