# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 94-3714, 94-3856

_____

| | |
|---|---|
| United States of America, | * |
| | * |
|        Appellee-Cross- | * |
| Appellant, | * |
| | * Appeals from the United States |
|    v. | * District Court for the |
| | * District of Minnesota. |
| James Herman O'Hagan, | * |
| | * |
|        Appellant-Cross- | * |
| Appellee. | * |
| | * |
| _____ | * |
| | * |
| Securities and Exchange | * |
| Commission, | * |
| | |
|      Amicus on Behalf of | |
| Appellee. | |

_____

Submitted: October 20, 1997
Filed: April 1, 1998

_____

Before FAGG, LAY, and HANSEN, Circuit Judges.

_____

HANSEN, Circuit Judge.

This case comes to us for a second time following a remand to this court by the United States Supreme Court in United States v. O'Hagan, 117 S. Ct. 2199, 2220 (1997). In our prior opinion, United States v. O'Hagan, 92 F.3d 612 (8th Cir. 1996),

we reversed defendant James Herman O'Hagan's convictions for securities fraud, mail fraud, and money laundering. The Supreme Court reversed that decision, holding that: (1) a defendant could be convicted of securities fraud based on the "misappropriation theory"; and (2) the Securities and Exchange Commission (SEC) had the authority to prohibit acts which were not themselves fraudulent under the common law or § 10(b) of the Exchange Act. O'Hagan, 117 S. Ct. at 2213-14, 2217. The Court remanded the case to us, leaving for us to resolve a number of issues we had not reached in our first decision. Id. at 2220. These issues include O'Hagan's numerous arguments for reversal of his convictions and challenges to his sentences. We also now address the government's cross-appeal asserting errors in sentencing. We affirm O'Hagan's securities fraud and mail fraud convictions, leave undisturbed our prior reversal of his money laundering convictions, and remand to the district court for resentencing.

## I. Factual and Procedural Background

O'Hagan was a senior partner in the 275-lawyer Dorsey & Whitney law firm in Minneapolis, Minnesota, specializing in medical malpractice and securities law cases. From July 1988 through September 1988, Dorsey & Whitney was local counsel representing Grand Metropolitan PLC (Grand Met), a company based in London, England, regarding a contemplated tender offer for the common stock of the Pillsbury Company (Pillsbury), headquartered in Minneapolis.

On August 18, 1988, O'Hagan began purchasing call options for Pillsbury stock, each option giving him the right to purchase 100 shares of Pillsbury stock by a certain date at a specified price. Later in August and in September, he made additional purchases of Pillsbury call options. By the end of September, O'Hagan owned 2,500 unexpired Pillsbury call options, more than any other individual investor in the world. O'Hagan also purchased 5,000 shares of Pillsbury common stock in September 1988. O'Hagan's wholesale purchases of Pillsbury options represented a major shift from his

previous avoidance of high risk option trading.  The evidence showed O'Hagan mortgaged his home to purchase some of them.

On October 4, 1988, Grand Met publicly announced its tender offer for Pillsbury stock.  The price of Pillsbury stock immediately rose from $39 per share to almost $60 per share.  Shortly after the announcement, O'Hagan exercised his options, buying Pillsbury stock at the lower option price, and then sold this stock at the higher market price generated by the tender offer.  O'Hagan also sold the 5,000 shares of common stock that he had purchased in September at the lower preoffer price. O'Hagan realized a profit of over $4 million from these securities transactions.

O'Hagan later was charged in a 57-count indictment for mail fraud, securities fraud, and money laundering.  Counts 1-20 charged him with mail fraud in violation of 18 U.S.C. § 1341 (1988).  Counts 21-37 charged him with securities fraud in violation of § 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78ff(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (1997), promulgated thereunder.  Counts 38-54 charged O'Hagan with securities fraud in violation of § 14(e) of the Exchange Act, 15 U.S.C. §§ 78ff(a), 78n(e), and Rule 14e-3, 17 C.F.R. § 240.14e-3(a) (1997), promulgated thereunder.  Counts 55-57 alleged various violations of the federal money laundering statutes, 18 U.S.C. §§ 1956(a)(1)(B)(i) and 1957.  The indictment alleged that O'Hagan defrauded Dorsey & Whitney and its client, Grand Met, by using for his own securities trading purposes material, nonpublic information regarding Grand Met's planned tender offer. The indictment also alleged that O'Hagan used the profits he gained during this trading to conceal his previous embezzlements and conversions of Dorsey & Whitney's clients' trust funds.

A jury convicted O'Hagan on all 57 counts, and he was sentenced to 41 months' imprisonment.  The district court gave O'Hagan credit for 23 of the 30 months he served in state prison for state law convictions arising from his theft of the client trust funds.  O'Hagan then appealed his convictions and sentences.  We initially reversed

O'Hagan's convictions on all counts. <u>O'Hagan</u>, 92 F.3d at 628. The Supreme Court then granted certiorari, <u>United States v. O'Hagan</u>, 117 S. Ct. 759 (1997), reversed this court's judgment as to all counts except the money laundering counts, and remanded this case for further proceedings. <u>O'Hagan</u>, 117 S. Ct. at 2220.

## II.  Money Laundering Convictions

In our initial opinion, we reversed O'Hagan's convictions for money laundering and the government did not seek review of that ruling by the Supreme Court. <u>O'Hagan</u>, 117 S. Ct. at 2219 n.24. Thus, the Supreme Court left undisturbed that portion of our prior opinion. <u>Id.</u>  Therefore, O'Hagan's money laundering convictions remain reversed. We now address the parties' arguments that were not resolved in our prior opinion and which were reserved to us in the Supreme Court's opinion.

## III.  Rule 10b-5 Securities Fraud Convictions

O'Hagan argues that his convictions for securities fraud in violation of Rule 10b-5 must be reversed because the government failed to prove that he "willfully" violated the rule. O'Hagan claims that in order to prove willfulness, the government must establish that he both knew what acts Rule 10b-5 prohibited and that he intentionally committed acts in violation of the rule. Section 10(b) of the Exchange Act provides, in relevant part:

> Any person who willfully violates any provision of this chapter . . . or any  rule or regulation thereunder the violation of which is made unlawful. . .  shall upon conviction be fined not more than $100,000, or imprisoned not more than five years, or both . . . ; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

4

15 U.S.C. § 78ff(a) (1987).[1]

O'Hagan bases his argument on the following language from the Supreme Court's opinion in this case:

> Vital to our decision that criminal liability may be sustained under the misappropriation theory, we emphasize, are two sturdy safeguards Congress has provided regarding scienter. To establish a criminal violation of Rule 10b-5, the Government must prove that a person "willfully" violated the provision. <u>See</u> 15 U.S.C. § 78ff(a). Furthermore, a defendant may not be imprisoned for violating Rule 10b-5 if he proves that he had no knowledge of the rule. <u>See ibid</u>.

<u>O'Hagan</u>, 117 S. Ct. at 2214 (footnote omitted).

Contrary to O'Hagan's present claim, we think it is clear that the Supreme Court was simply explaining that the statute provides that a negligent or reckless violation of the securities law cannot result in criminal liability; instead, the defendant must act willfully. <u>See</u> 15 U.S.C. § 78ff(a). The Court also explained that the defendant has an affirmative defense to imprisonment if he proves he did not know of the rule or regulation pursuant to which he was convicted. <u>See</u> <u>id.</u> O'Hagan offered no such proof at trial or sentencing. Contrary to O'Hagan's claim, the Supreme Court, in holding that the misappropriation theory could be a basis for criminal liability under Rule 10b-5, did not create a requirement that a defendant know that his acts were in violation of Rule 10b-5. We must therefore interpret § 10(b) to determine what the term "willfully" requires.

---

[1]The 1988 amendments to this section, providing for a fine of "not more than $1,000,000" and imprisonment for "not more than 10 years" for convictions, were not applicable to actions occurring before November 19, 1988. <u>See</u> Pub. L. 100-704, § 9 (1988). Because O'Hagan's securities transactions occurred before that date, the older statute applies.

The meaning of the term "willfully" varies with the context in which the term is used. See Ratzlaf v. United States, 510 U.S. 135, 141 (1994); ("'Willful,' as this Court has recognized, is a 'word of many meanings,' and 'its construction [is] often . . . influenced by its context.'") (quoting Spies v. United States, 317 U.S. 492, 497 (1943) (alteration and ellipses in original)). Although O'Hagan cites cases recognizing that "willfully" sometimes requires knowledge that one's acts are in violation of the law, these cases are an exception to the "general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution." Cheek v. United States, 498 U.S. 192, 199-200 (1991) (explaining that the Court "carv[ed] out an exception" to the general rule for criminal income tax offenses because of the "complexity of the tax laws"); Ratzlaf, 510 U.S. at 143-46 (explaining that because illegal cash transaction structuring is not "inevitably nefarious" and could occur for a benign reason, a willful violation requires the defendant's knowledge that his acts violate the law). The rationale of Cheek and Ratzlaf, that knowledge of the law is required in order to prevent criminal conviction for conduct that may often be innocently undertaken, does not apply to § 10(b). Criminal conviction for violation of rules and regulations implementing § 10(b) necessarily involves fraudulent conduct and breaches of duty by the defendant. Such acts do not involve conduct that is often innocently undertaken.

More importantly, the text of § 10(b) itself requires us to reject the interpretation O'Hagan urges. The statute specifically provides that lack of knowledge of a rule or regulation is an affirmative defense to imprisonment, rather than conviction. 15 U.S.C. § 78ff(a) ("no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation") (emphasis added).[2] Courts that have interpreted "willfully" in § 10(b) have reached the same conclusion that we reach in this case: "willfully" simply requires

---

[2]The statute provides no such defense to the imposition of a fine. O'Hagan, 117 S. Ct. at 2214, n.13.

6

the intentional doing of the wrongful acts—no knowledge of the rule or regulation is required. See United States v. Charnay, 537 F.2d 341, 351-52 (9th Cir.), cert. denied, 429 U.S. 1000 (1976); United States v. Dixon, 536 F.2d 1388, 1395 (2d Cir. 1976) (Friendly, J.).

O'Hagan next claims that there was insufficient evidence for the Rule 10b-5 convictions. "We will reverse for insufficient evidence only if a reasonable fact-finder must have a reasonable doubt about an essential element of the offense." United States v. Moore, 98 F.3d 347, 349 (8th Cir. 1996). We view the evidence in the light most favorable to the government. United States v. Shoffner, 71 F.3d 1429, 1433 (8th Cir. 1995).

O'Hagan was convicted under the "misappropriation theory," which requires the government to prove that he obtained information that was material and nonpublic, that he used this information to trade securities, and that he breached a duty owed to the source of the information. O'Hagan, 117 S. Ct. at 2207. Our review of the evidence convinces us that each of these essential elements was proven by sufficient evidence.

O'Hagan initiated a conversation with a Dorsey & Whitney partner, Thomas Tinkham, who was handling Grand Met's local work, a few days before August 26, 1988, regarding plans by a client of the firm to make a tender offer for Pillsbury. O'Hagan told Tinkham that he understood Tinkham was doing work on a takeover of Pillsbury. Tinkham acknowledged this and sought input from O'Hagan on whether the firm should represent a client interested in making a tender offer for a local company, an issue to be discussed by several partners at an August 26, 1988, meeting.

From this conversation O'Hagan obtained material, nonpublic information about Pillsbury stock. He learned that a client of his law firm (and therefore a client of his) was preparing to make a tender offer for Pillsbury stock. He learned that his law firm was working on the takeover. The jury could also have reasonably concluded from his

7

large purchases of Pillsbury options and stock which occurred after his meeting with Tinkham, taken together with his extensive knowledge of how the securities market operates, that he also knew that the plan was soon to be implemented.[3]  This information was not available to the public and was important because "[w]hen a tender offer is announced, usually the price of the target company rises." See SEC v. Maio, 51 F.3d 623, 628 n.3 (7th Cir. 1995).  This was clearly material information because there is a substantial likelihood that a reasonable investor would consider it important to know in deciding whether to buy, sell, or hold Pillsbury stock.  See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).

Despite O'Hagan's claims to the contrary, contemporaneous media reports speculating that Pillsbury would be taken over by Grand Met do not render the information O'Hagan learned immaterial or nonpublic.  Financial analysts testified that these media reports were "not taken seriously," and were dismissed because "newspapers are always having articles of rumors." The market as a whole attributed little to these reports as evidenced by the lack of significant movement in Pillsbury stock price upon dissemination of the stories.  The reports themselves concerned only speculation about a takeover of Pillsbury, whereas O'Hagan now had firsthand, concrete knowledge that a client and his law firm were preparing a plan to take over Pillsbury. The information that O'Hagan obtained went beyond that which had been publicly disseminated.[4]  We believe a reasonable investor would have considered this

---

[3]O'Hagan makes much of the fact that he apparently did not know the identity of the company interested in acquiring Pillsbury.  This, however, is of little significance because first, the price of the target company usually rises after the announcement of a tender offer irrespective of who the offeror is, and second, he owed a duty to any and all of the law firm's clients.

[4]The Second Circuit reached the same conclusion on facts similar to this case. See United States v. Mylett, 97 F.3d 663, 666-67 (2d Cir. 1996) (inside information of a merger that had been the subject of media speculation is nonpublic information), cert. denied, 117 S. Ct. 2509 (1997).

additional information about what Dorsey & Whitney and its client were doing vis-a-vis Pillsbury to have "significantly altered the 'total mix' of information [then] available." TSC Indus., 426 U.S. at 449.

O'Hagan also traded in securities based on this material, nonpublic information. On Friday, August 26, following a series of conversations with one of his brokers, Steuart Evans, O'Hagan authorized Evans to buy 500 October Pillsbury option contracts. On that same day, O'Hagan authorized another broker, Pat Kinnahan, to purchase 50 Pillsbury option contracts. Evans purchased for O'Hagan's account an additional 1,022 October option contracts between August 29, 1988, and September 7, 1988, based on a misunderstanding of his previous conversation with O'Hagan. On September 7, 1988, O'Hagan learned of these additional purchases and expressly authorized and ratified them. On this same date, O'Hagan authorized Evans to purchase additional Pillsbury option contracts, so that O'Hagan would own a total of 2,000 option contracts. Evans then bought these additional contracts between September 7, 1988 and September 12, 1988. Also on September 7, 1988, O'Hagan directed Kinnahan to purchase another 50 Pillsbury option contracts, which she did. On September 19, 1988, O'Hagan instructed Evans to buy 500 November option contracts, although the broker was only able to purchase 100. On September 20 and 21, 1988, O'Hagan agreed to purchase another 300 October option contracts. On September 20, 1988, O'Hagan also authorized Michael Mulligan to buy 5,000 shares of Pillsbury stock for him.

Finally, there was sufficient evidence that O'Hagan breached duties that he owed to the source of his information. He owed both Grand Met, his firm's client, and Dorsey & Whitney, his firm, duties of trust and confidentiality, and a duty not to use the client's confidential information for his own benefit. He breached these duties when he traded in securities based on the information he learned because of the firm's

9

representation of Grand Met.  It was for the jury to decide from the abundance of evidence presented to it concerning what information was available from what sources whether O'Hagan used the information he acquired in his conversation with Tinkham about the planned takeover of Pillsbury when he thereafter traded in Pillsbury securities, or whether he made the trades based on other information available to him in the market.  After a careful review, we conclude there was sufficient evidence to support O'Hagan's Rule 10b-5 convictions by the jury.

IV.  Section 14(e) and Rule 14e-3(a) Convictions

O'Hagan argues that his securities fraud convictions under § 14(e) of the Exchange Act and Rule 14e-3(a) must be reversed.  Section 14(e) provides:

> It shall be unlawful for any person . . . to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . . The [SEC] shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e).  The SEC has promulgated rules and regulations pursuant to this section, including Rule 14e-3(a), which provides:

> If any person has taken <u>a substantial step or steps</u> to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:
> . . . .

10

> (3) Any . . . person acting on behalf of the offering person . . . to . . . cause to be purchased or sold any of such securities . . . or any option or right to obtain . . . any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e-3(a) (emphasis added).

O'Hagan first argues that his convictions violate due process because he did not have fair notice of what constitutes "a substantial step or steps" towards a tender offer under Rule 14e-3(a). O'Hagan did not raise this claim in the district court or in his initial briefing to this court. He raised it for the first time in his briefing before the Supreme Court. See O'Hagan, 117 S. Ct. at 2219. O'Hagan has therefore waived this claim. See United States v. Darden, 70 F.3d 1507, 1549 n.18 (8th Cir. 1995) ("Appellants generally must raise and brief all issues in their opening brief."), cert. denied, 116 S. Ct. 1449 (1996). We see no compelling reason to address it, particularly when O'Hagan himself was a practicing lawyer specializing in securities law work. Likewise, O'Hagan claims that the due process clause requires this court to read into Rule 14e-3(a) a requirement that he had knowledge of the substantial step or steps taken prior to the tender offer. O'Hagan raised this argument for the first time in his brief to the Supreme Court. See O'Hagan, 117 S. Ct. at 2219. Therefore, this claim has not been preserved. See Darden, 70 F.3d at 1549 n.18. We decline to address it.

O'Hagan next claims that the jury was improperly instructed on the Rule 14e-3(a) counts because the jury was informed he did not have to know

that substantial steps had been taken prior to the tender offer.[5]  We reject
this argument.  Rule 14e-3(a)

-------------------------

[5]The jury was instructed:

> With respect to [the Rule 14e-3(a) counts], you must find that
> Grand Met had taken one or more substantial steps to commence
> its tender offer for Pillsbury stock at the time that O'Hagan had
> purchased the relevant Pillsbury securities.  It is not necessary for
> a bidder to make a tender offer for you to find that substantial steps
> toward such an offer have been taken or made.  <u>Nor is it necessary
> that you find that the defendant knew that the substantial steps had
> been taken.</u>  It is enough that you find one or more substantial steps
> were in fact taken.

(Trial Tr. Vol. XII at 39) (emphasis added).

requires that "any person" must have taken "a substantial step or steps" towards the tender offer. 17 C.F.R. § 240.14e-3(a). The rule does not require the defendant to have knowledge of these acts. Instead, the defendant need only "know[] or have reason to know" that the material information is "nonpublic and has been acquired directly or indirectly from" the tender offeror in some way. Id.

Next, O'Hagan argues that the SEC exceeded its rulemaking authority in promulgating Rule 14e-3(a) because § 14(e) does not grant the SEC authority to prohibit conduct that occurs in advance of a tender offer. We reject this argument. Section 14(e) prohibits "fraudulent, deceptive or manipulative acts or practices, in connection with any tender offer." 15 U.S.C. § 78n(e) (emphasis added). This section also directs the SEC to promulgate rules that "define" these acts and "prescribe means reasonably designed to prevent" these acts. Id. The expansive language of § 14(e) shows that "Congress intended § 14(e) to be a broad antifraud remedy in the area of tender offers." S.E.C. v. Mayhew, 121 F.3d 44, 53 (2d Cir. 1997). Acts occurring after a substantial step towards a tender offer has been made qualify as acts occurring in connection with a tender offer. Thus, we hold Rule 14e-3(a), prohibiting conduct occurring after "a substantial step or steps" have been taken towards a tender offer, does not exceed the SEC's broad authority pursuant to § 14(e) to prohibit conduct "in connection with any tender offer." To decide otherwise would be contrary to both the language and purpose of § 14(e).

O'Hagan challenges the sufficiency of the evidence supporting his Rule 14e-3(a) convictions, claiming substantial steps prior to a tender offer had not occurred. Our review of the record convinces us that there was sufficient evidence to support the guilty verdicts. Extensive evidence was presented regarding the substantial steps that Grand Met had taken to commence a tender offer for Pillsbury stock prior to O'Hagan's securities trading. Grand Met had retained law firms in New York and Minneapolis to advise it on the tender offer for Pillsbury and had determined how it would finance the tender offer. On August 16, 1988, Grand Met's board of directors had approved the acquisition of all shares of Pillsbury through a tender offer, and a launch date for the takeover effort had been identified. A reasonable jury could easily conclude that Grand Met had taken substantial steps to commence a tender offer for Pillsbury.

O'Hagan also contends that his securities fraud convictions under both Rule 10b and Rule 14e-3 must be reversed because the indictment was not returned within the applicable statute of limitations. O'Hagan asserts that the applicable statue of limitations is one year after the discovery of the violation, or three years after the violation actually occurred, citing Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350 (1991). We disagree with this assertion. The Court in Lampf was addressing the issue of which limitations period to apply to a private cause of action brought pursuant to § 10(b). Id. at 352. The proper limitations period for the criminal securities fraud counts brought against O'Hagan is the five-year statute of limitations set forth in 18 U.S.C. § 3282 (1988). See United States v. United Med. & Surgical Supply Corp., 989 F.2d 1390, 1398 (4th Cir. 1993). Thus, the securities fraud indictment must have been brought within five years of the completion of O'Hagan's securities fraud. See Pendergast v. United States, 317 U.S. 412, 418 (1943) ("Statute of limitations normally begin to run when the crime is complete."). The indictment in this case was returned on December 17, 1992, less than five years after the securities

law violations.  We therefore reject O'Hagan's argument that his securities fraud convictions were barred by the statute of limitations.[6]

## V.  Mail Fraud Convictions

O'Hagan contends that his mail fraud convictions must be reversed. He first asserts that the indictment charging him with mail fraud is defective because it fails to charge him with an essential element of mail fraud—that he defrauded the victim of a property right.

We review de novo a challenge to the sufficiency of an indictment. United States v. Morris, 18 F.3d 562, 567 (8th Cir. 1994).  "[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  Hamling v. United States, 418 U.S. 87, 117 (1974).  This rule ensures that the grand jury has considered and found all essential elements of the offense charged.  United States v. Zangger, 848 F.2d 923, 925 (8th Cir. 1988).  An indictment should not be read in a hyper technical fashion and should be "deemed sufficient unless no reasonable construction can be said to charge the offense."  Morris, 18 F.3d at 568 (internal quotation omitted).  It is not necessary "for a particular word or phrase [to] appear in the indictment when the element is alleged 'in a form' [that] substantially states the element."  United States v. Mallen, 843 F.2d 1096, 1102 (8th Cir.) cert. denied, 488 U.S. 849 (1988).  However, "[i]f an essential element of the charge has been omitted from the indictment, the

---

[6]We also reject O'Hagan's contention that venue was improper for the securities fraud convictions.  18 U.S.C. § 78aa provides that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred."  O'Hagan conducted all of his trading in Pillsbury securities, the acts or transactions constituting the securities law violations, while he was in Minnesota. The criminal proceeding was properly brought in the District of Minnesota.

omission is not cured by the bare citation of the charging statute." Zangger, 848 F.2d at 925.  If an essential element is omitted from the indictment, then the defendant's Fifth Amendment right to be tried on charges found by a grand jury has been violated.  Id.

Applying these principles here, we conclude that the indictment was sufficient.  Paragraph 2 of the indictment alleged that O'Hagan engaged in a scheme and artifice to defraud Grand Met and Dorsey & Whitney by purchasing Pillsbury securities while in possession of material, nonpublic information regarding Grand Met's planned tender offer for Pillsbury stock. Paragraph 14 charged that Dorsey & Whitney was asked to provide legal services to Grand Met in connection with Grand Met's tender offer for Pillsbury stock and that O'Hagan learned of the future tender offer and Dorsey & Whitney's representation through Tinkham.  The indictment, reasonably read, charges O'Hagan with the fraudulent use of confidential business information held by Grand Met and Dorsey & Whitney.  Confidential business information is considered "property" as that term is used in the federal mail fraud statute.  Carpenter v. United States, 484 U.S. 19, 25-27 (1987).  The specific term "property" does not need to be used here because the element is alleged in a form that substantially states the element.  See Mallen, 843 F.2d at 1102.  Thus, the indictment, reasonably read, alleges that O'Hagan defrauded Grand Met and Dorsey & Whitney of property under the mail fraud statute.

O'Hagan next argues that there is insufficient evidence to support his mail fraud convictions.  Specifically, O'Hagan claims that the mailing of securities trading confirmation slips to him by his brokers cannot support a conviction for mail fraud.  He bases his argument on two grounds.  First, he asserts that because the mailings were required by law they cannot, as a matter of law, be the basis for a mail fraud conviction, citing Parr v. United States, 363 U.S. 370, 391 (1960).  Second, he contends that even if the law did not require the mailings, the confirmation slips were not mailed in furtherance of his scheme to defraud.

We reject O'Hagan's first argument.  SEC Rule 10b-10 requires brokers to disclose certain information in writing to their customers when they trade securities for their customers.  17 C.F.R. § 240.10b-10 (1997).  These written disclosures are often called confirmation slips.  Rule 10b-10 makes it "unlawful for any broker" to trade securities unless the broker "<u>gives</u> or sends" these confirmation slips to the customer.  <u>Id.</u> (emphasis added).  Thus, contrary to O'Hagan's arguments, the Rule does not require brokers to <u>mail</u> confirmation slips to customers.  It only requires such slips to be given or sent to the customer.

We also reject O'Hagan's contention that the mailing of the confirmation slips did not further his scheme to defraud.  The federal mail fraud statute reaches "only those limited instances in which the use of the mails is a part of the execution of the fraud."  <u>Schmuck v. United States</u>, 489 U.S. 705, 710 (1989) (internal quotes omitted).  "To be part of the execution of the fraud, however, the use of the mails need not be an essential element of the scheme.  It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot."  <u>Id.</u> at 710-11 (internal quotes, alterations, and citations omitted).  To determine if this requirement has been met, the "relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time."  <u>Id.</u> at 715.

O'Hagan's scheme to defraud involved not only the unlawful purchases of Pillsbury securities, but also the use of the profits obtained from the illegal trading to conceal his prior misappropriation of client funds.  The confirmation slips informed O'Hagan that the Pillsbury securities had been purchased and provided him a record of his purchases.  <u>See</u> <u>United States v. Grossman</u>, 843 F.2d 78, 86 (2d Cir. 1988) <u>cert. denied</u>, 488 U.S. 1040 (1989); <u>see</u> <u>also</u> <u>United States v. Naftalin</u>, 606 F.2d 809, 811 (8th Cir. 1979) ("[C]ourts rather uniformly have held that the mailings of confirmation slips are sufficiently related to a scheme to defraud in the sale of stock to provide jurisdiction for criminal charges under the Securities Act.").  This record-keeping function aided O'Hagan in his scheme to defraud.  The jury could reasonably conclude

17

that the confirmation slips helped O'Hagan keep track of his numerous Pillsbury option contract purchases made at various prices, in different quantities, with different strike prices, different expiration dates, and from different brokers, particularly given O'Hagan's testimony before the SEC that he called one of his brokers after he received a confirmation slip to inquire about that option's expiration date. We have little difficulty rejecting O'Hagan's claim and concluding that the confirmation slips aided in O'Hagan's scheme to defraud.

O'Hagan next claims the district court erred in instructing the jury on the mail fraud counts. Mail fraud requires the government to prove "the existence of a plan or scheme to defraud, that it was foreseeable that the scheme would cause the mails to be used, and that the use of the mails was for the purpose of carrying out the fraudulent scheme." United States v. Goodman, 984 F.2d 235, 237 (8th Cir.1993). O'Hagan challenges the jury instruction defining the first essential element of mail fraud—the scheme to defraud. This instruction provided that

> The crime of mail fraud has four essential elements, [the first of which is that] the defendant voluntarily and intentionally devised or made up a scheme to defraud Grand Met or Dorsey & Whitney out of money, property, or property rights by purchasing Pillsbury securities <u>while in possession of</u> material nonpublic information, and using the profits obtained therefrom to conceal his previous use and possession of client trust funds.

(Trial Tr. Vol. XII at 21) (emphasis added).

O'Hagan argues that the instruction erroneously allowed the jury to convict him of mail fraud if it found he purchased Pillsbury securities while merely <u>possessing</u>, rather than <u>using</u>, material nonpublic information. Central to O'Hagan's contention is that the mail fraud indictment alleged that his scheme to defraud was the securities fraud he committed trading Pillsbury securities. O'Hagan claims that to establish this

18

essential element of a scheme to defraud the government was required to prove he committed securities fraud, which in turn requires the government to prove that he traded Pillsbury securities "on the basis of," rather than "while in possession of," the material, nonpublic information he obtained while at Dorsey & Whitney.

Assuming without deciding that for O'Hagan to be convicted of securities fraud he must have traded "on the basis of" material, nonpublic information, rather than just trading "while in possession of" this information, we hold that any error in the challenged instruction was harmless.[7] The jury was instructed that in order to convict O'Hagan on the Rule 10b-5 securities fraud counts it had to find that he "used" the material, nonpublic information "to trade securities with the intent to defraud." (Trial Tr. Vol. XII at 28.) Similarly, to convict O'Hagan of the Rule 14e-3 securities fraud counts the jury had to find that O'Hagan "purchased or caused to be purchased Pillsbury common stock or options on Pillsbury common stock using this material nonpublic information." (Id. at 38.) Because O'Hagan was found guilty on all the securities fraud counts, the jury necessarily must have found that he traded in Pillsbury securities while using the material, nonpublic information. We find it highly unlikely that the jury convicted O'Hagan of mail fraud based on his mere possession of the material, nonpublic information, when in the securities fraud counts they found he used, not merely possessed, this information when trading in Pillsbury securities. Because

---

[7]In United States v. Teicher, 987 F.2d 112, 119-21 (2d Cir.), cert. denied 510 U.S. 976 (1993), the Second Circuit opined that "knowing possession" of material nonpublic information obtained from a breach of duty should be sufficient for a criminal violation of Rule 10b-5. The court explained that "[u]nlike a loaded weapon which may stand ready but unused, material information can not lay idle in the human brain." Id. at 120. However, the Second Circuit found it unnecessary to resolve the issue because it held that even if the district court erred in instructing the jury that mere possession of the information was sufficient for conviction, the error was harmless. Id. at 121.

O'Hagan suffered no prejudice from the challenged instruction, we hold any error in the instruction was harmless.

## VI. Sentencing

### A.

Both parties claim that the district court erred in its sentencing of O'Hagan.  At sentencing, all of the 57 counts of conviction were subject to the grouping rules of USSG § 3D1.2.  The mail fraud convictions (Counts 1-20) were governed by the fraud guideline, USSG § 2F1.1; the securities fraud convictions (Counts 21-54) were also governed by USSG § 2F1.1 and § 2F1.2; and the money laundering convictions were governed by USSG § 2S1.1 and § 2S1.2.  Section 3D1.2(d), one of the grouping rules, requires that counts be grouped together when the offense level is determined largely on the basis of the total amount of harm or loss.  Moreover, § 3D1.2(d) specifically provides that offenses covered by USSG §§ 2F1.1, 2F1.2, 2S1.1, and 2S1.2 are to be grouped together for sentencing.  Accordingly, the presentence investigation report (PSIR) first (1) grouped the twenty individual mail fraud counts together, (2) grouped the individual securities fraud counts (21-54) together, and (3) grouped the three individual money laundering counts (55-57) together.  Then the mail fraud group of counts and the securities fraud group of counts were themselves grouped together in one larger group pursuant to § 3D1.2(b).  That larger group containing all the combined fraud counts was then itself grouped together with the group containing the money laundering counts pursuant to § 3D1.2(c) because the unlawful fraudulent activities represented by Counts 1-54 were the basis for a two-level specific offense characteristic increase under the money laundering guideline, see § 2S1.2(b)(1)(B).  Consequently, all of the counts of conviction were then contained in one larger group for Sentencing Guideline range determination.  In those circumstances, the most serious counts, i.e., those carrying the highest offense level, in this case the money laundering counts, determine the offense level for the entire group. See USSG § 3D1.3(a).  That

is why the district court stated that the money laundering counts were the driving factor in determining the total offense level of 24. (Sent. Tr. at 33.) Finding that the case was not within the heartland of money laundering cases, but that it was really an insider trading case, the district court departed downward two levels pursuant to USSG § 5K2.0, which resulted in an offense level of 22. That offense level, when coupled with O'Hagan's government-conceded Criminal History Category I, resulted in a guideline range of 41-51 months. The district court sentenced O'Hagan at the bottom of the range to 41 months' confinement on all of the individual counts, and then gave him credit against the 41-month federal sentences for 23 of the 30 months he had served in a Minnesota state prison for his state theft convictions.

Our unappealed and unreversed prior reversal of the money laundering counts removes from the district court's Sentencing Guidelines' determination those counts which drove the 41-month sentences. With the money laundering counts out of the sentencing equation, the defendant's sentences must be redetermined taking into account only the fraud convictions. Fortunately, the district court took the necessary extra time at sentencing to determine what the offense level would be for the fraud counts themselves. (See Sent. Tr. at 32.) The court determined the starting point as level 8 pursuant to USSG § 2F1.2(a), the guideline for insider trading. It then added eleven levels from § 2F1.1(b)(1)(L) to account for the more than $5 million in "gain resulting from the offense(s)" as required by § 2F1.2(b)(1) (1987).[8] The court arrived

---

[8]The district court correctly used the 1987 version of § 2F1.1, effective at the time O'Hagan committed his securities fraud offenses, to sentence O'Hagan. Application of the 1993 version of § 2F1.1, in force at the time of O'Hagan's October 27, 1994, sentencing, see 18 U.S.C. § 3553(a)(4), would have produced a larger increase in O'Hagan's base offense level, resulting in a harsher sentence. See USSG § 2F1.1 (1993) (gain of over $5 million results in a 14-level increase). Imposing this harsher sentence would be a violation of the ex post facto clause of the constitution. See United States v. Bell, 991 F.2d 1445, 1452 (8th Cir. 1993) ("[T]he ex post facto clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed."). USSG § 1B1.11 (1993) requires that a court use the Guidelines Manual in effect on the date that the defendant is sentenced unless its use would violate the ex post facto clause. In that event, the Guidelines Manual in effect on the date the offense of conviction was committed should be used in its entirety. United States v. Lenfesty, 923 F.2d 1293, 1299 (8th Cir. 1991); see also United States v. Lance, 23 F.3d 343, 344 (11th Cir. 1994) (collecting cases).

at the $5 million plus figure by adding together the $1.9 million O'Hagan had misappropriated from his clients represented by the Minnesota state court convictions with the $4.2 million in gain he realized from his Pillsbury stock transactions. The court then found that O'Hagan had breached a position of trust pursuant to USSG § 3B1.3 and assessed a two-level enhancement, which resulted in a total offense level of 21 (8 + 11 + 2 = 21) for the grouped fraud counts. The guideline range for a Level 21 - Criminal History Category I offender is 37 to 46 months. We note that O'Hagan's present 41-month sentences fall at the midpoint of that range. Because the mail fraud and securities fraud counts were grouped together, the court made no separate findings as to the mail fraud counts' offense level. O'Hagan made no objection to the grouping of the fraud counts at sentencing. Even assuming that the mail fraud counts' offense level would be less if calculated separately, the application of § 3D1.3 would again require that the higher offense level attributable to the insider trading fraud counts be used to sentence all counts within the larger group composed of all of the fraud counts (1-54). As noted above, USSG § 3D1.2(d) requires the grouping of all counts governed by §§ 2F1.1 and 2F1.2. <u>See also</u> USSG § 5G1.2(b).

O'Hagan did object to the court's calculation of the amount of the "gain resulting from the offenses," and to the court's two-level enhancement for abuse of a position of trust. Because the correctness of the court's separate guidelines determination with respect to the fraud counts (1-54) needs to be determined in order to decide if O'Hagan should be resentenced on those counts, we proceed to consider O'Hagan's objections.

With respect to the "gain resulting from the offense," O'Hagan contends that the court erred in including the $1.9 million he purloined from his clients and for which he was convicted in state court. As noted above, the district court added the $1.9 million to the $4.2 million realized in the stock transactions to arrive at a total amount above the $5,000,000 "add 11 levels" break point contained in USSG § 2F1.1(b)(L) (1987). If the $1.9 million were not included, only 10 levels for gain would be added, which would result in a combined offense level of 20 yielding a guidelines range of 33 to 41 months. We note that O'Hagan's present 41-month sentences fall at the top of that range.

O'Hagan's criminal conduct in pilfering his client's trust funds to the tune of $1.9 million, which resulted in his eight state court theft convictions and his service of a 30-month prison sentence, had the potential for affecting his federal sentences in three separate ways. First, as shown above, if that conduct is considered as part of his "relevant conduct" pursuant to USSG § 1B1.3, the inclusion of the $1.9 million raises his total offense level by one level. Second, if the prior state court sentences are for "unrelated cases," then they are counted for criminal history purposes. See USSG § 4A1.2(a)(2) comment. (n.3). In O'Hagan's case, the PSIR considered the state court sentences to be "unrelated" and assessed O'Hagan three criminal history points for the prior convictions and placed him in Criminal History Category II where the sentencing ranges are higher. Third, if his prior state court sentences were imposed in "unrelated cases," he would not be able even to argue that he should receive credit against his federal sentences for any of the time served in state prison. He could only logically argue he was entitled to credit if the federal and state cases were somehow factually tied together.

At sentencing, O'Hagan formally objected to the assessment of the three criminal history points and to his Criminal History Category II designation. He argued strongly that the federal indictment recited the facts of his prior "embezzlements" at length, and that much of the government's evidence at the federal trial was devoted to showing

23

those thefts.  The government, while initially believing that the three criminal history points were correctly assessed, finally conceded that the state court prosecuted conduct was "inextricably intertwined" with the charges contained in the federal indictment and agreed that no criminal history points should be assessed and that O'Hagan was a Criminal History Category I offender.  (See Sent. Tr. at 6.)  O'Hagan also argued hard at sentencing that because the government had conceded that the prior state court sentences were so closely related to his federal crimes he should receive full credit against his federal sentences for all of the 30 months he spent in state prison.  The district court agreed that the prior state sentences were "related cases" for criminal history purposes.  (Sent. Tr. at 30) ("I concur in the government's tardy but timely recognition that the present offenses for which you will be sentenced are intimately involved in the prior offenses for which you previously did time.")) (Sent. Tr. at 33-34) ("Here you are in category one in terms of your sentence.  The Hennepin County District Court convictions for theft were obviously a part of this transaction."))  The district court also agreed that O'Hagan should receive some credit for the state time served and, as noted, credited 23 months against the 41-month sentences in an exercise of departure discretion. (See Sent. Tr. at 35.)  Having convinced both the government and the district court that his state crimes were part and parcel of his federal criminal conduct so as to preclude counting them for criminal history purposes, and having convinced the district court that the state crimes were "obviously" part of the federal conduct so as to justify and receive 23 months' credit, we find it totally inconsistent for O'Hagan to claim that the thefts were not "relevant conduct" so as to preclude including their dollar amount in the gain realized.  Indeed, a strong argument can be made that he should be estopped from so asserting.  However, we prefer to decide the issue outright.  After a close examination of O'Hagan's total conduct, we conclude that the district court's fact findings regarding the amount of gain are not clearly erroneous, and that it committed no error when it decided that the thefts from the clients were relevant conduct pursuant to USSG § 1B1.3 and added the $1.9 million to the $4.2 million in stock transactions in calculating O'Hagan's offense level.

24

O'Hagan next claims that the district court's enhancement of his offense level by two levels for abuse of a position of trust pursuant to USSG § 3B1.3 was erroneous. He claims that the adjustment may not be employed because an abuse of trust is already included in the offense of securities fraud itself under the misappropriation theory. See USSG § 3B1.3 ("This adjustment may not be employed if an abuse of trust . . . is included in the base offense level. . .") We disagree.

To be convicted under the "misappropriation theory," O'Hagan had to breach a duty he owed to Grand Met or Dorsey & Whitney when he used the material nonpublic information to trade in Pillsbury stock. "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information." O'Hagan, 117 S. Ct. at 2207. Application Note 1 to the insider trader sentencing guideline states:

> Section 3B1.3 (Abuse of Position of Trust or Use of Special Skill) should be applied only if the defendant occupied or abused a position of special trust. Examples might include . . . an attorney who misused information regarding a planned but unannounced takeover attempt.

USSG § 2F1.2 comment. (n.1) (1987) (emphasis added).

We agree with the district court that a secretary or other employee at Dorsey & Whitney could have breached a duty to the firm and violated the securities laws under the misappropriation theory without abusing a position of special trust. O'Hagan was a senior partner at Dorsey & Whitney, it was his status as a senior partner that gave him access to his partner, Mr. Tinkham, and enabled him to broach the subject of the Pillsbury takeover, and we have no doubt that it was his status as a senior partner who specialized in securities law that contributed to Mr. Tinkham's willingness to confide

in him that Tinkham was in fact working for a client who was trying to take over Pillsbury and to seek his views as to whether the representation should continue.  In our view, O'Hagan occupied the position of special trust the application note envisions, and the district court committed no error in applying the two-level enhancement.

B.

We next consider the government's cross-appeal.  The government argues the district court improperly gave O'Hagan credit for 23 of the 30 months he served while imprisoned on the state convictions for misappropriation of client funds.  We review the district court's departure decision for an abuse of discretion.  <u>Koon v. United States</u>, 116 S. Ct. 2035, 2043 (1996). O'Hagan had already served his state sentence in full at the time the district court sentenced him.  As noted above, the government concedes that the conduct underlying O'Hagan's state law convictions was "inextricably intertwined" with the convictions here.  The  applicable 1987 Sentencing Guidelines do not provide for the granting of credit for time served for an expired sentence imposed for the same conduct underlying the offense for which the defendant is being sentenced.  <u>See</u> USSG § 5G1.3 (1987) (providing that the sentence shall run concurrently with an <u>unexpired</u> sentence arising out of the same conduct).[9]  A recent Fourth Circuit case supports the government's argument.  In <u>United States v. McHan</u>, 101 F.3d 1027, 1040 (4th Cir. 1996), <u>cert. denied</u>, 117 S. Ct. 2468 (1997), the court, over a dissent, and applying more recent versions of USSG § 5G1.3, held that a district court does not have the authority to depart downward and give credit for a discharged

---

[9]For the reasons expressed in USSG § 1.11 (1993), it is the 1987 version of § 5G1.3 that applies to O'Hagan's case.  Section 1B1.11(b)(2) (1993) states that if an earlier edition of the Guidelines is applied, "the court shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes."  Section 5G1.3 (1987) was deleted in its entirety by Amendment Number 289 in 1989 and replaced by a new section.  The amendment was not considered to be "clarifying" by the Sentencing Commission.

sentence. The Fourth Circuit noted that the Sentencing Guidelines expressly permit sentencing credit only for terms of imprisonment that are "undischarged." Id. The court then applied the "interpretative maxim expressio unius est exclusio alterius," and concluded that the Sentencing Commission must have "consciously denied" giving district courts the authority to grant credit for discharged sentences. Id.

The Seventh Circuit has reached the opposite conclusion. In United States v. Blackwell, 49 F.3d 1232, 1242 (7th Cir. 1995), the court encouraged the district court on remand to reconsider its decision to not depart downward and give credit for a discharged sentence. The Seventh Circuit recognized that USSG § 5G1.3 "on its face" did not apply, but found that "distinguishing between two defendants merely by virtue of their sentencing dates appears contrary to the Guidelines goal of eliminating unwarranted sentence disparities." Id. at 1241-42 (internal quotations omitted). Such a distinction also does not serve the purpose of § 5G1.3—to "ensure that a defendant is not penalized twice for the same conduct." Id. at 1241.[10] The Sentencing Commission had also advised the probation office that downward departure would be appropriate for the discharged sentence. Id.

We believe the interpretative maxim expressio unius est exclusio alterius applied in McHan is ill-suited for deciding whether the Sentencing Commission adequately considered whether a district court should have the authority to depart downward from the Sentencing Guidelines to give credit for an expired sentence imposed for the same relevant conduct. Downward departures are appropriate when there is a mitigating factor "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that" provided

---

[10]The Seventh Circuit even went so far as to suggest that "it perhaps could be argued that applying the guideline to undischarged sentences but not to discharged sentences lacks a rational basis and therefore violates the Constitution." Blackwell, 49 F.3d at 1242 n.20.

27

for by the guidelines. 18 U.S.C. § 3553(b); USSG § 5K2.0, p.s.  When a district court is contemplating a departure from an otherwise applicable guideline range, it must determine whether the feature of the case in front of it which it believes justifies departure is one that takes the case out of the Guidelines heartland.  <u>Koon</u>, 116 S. Ct. at 2045.  It must also determine whether that special factor is a forbidden factor, an encouraged factor, or a discouraged factor.  <u>Id.</u>  In this case, no provision in the 1987 version of the Guidelines or in the later rendition of § 5G1.3 forbids or prohibits the granting of a departure when a defendant has already served a state sentence for conduct which is included in the relevant conduct for which he is being sentenced in federal court.  No provision in the 1987 version of the Guidelines Manual discourages departure for that reason.  We think the inclusion of unexpired sentences without providing for expired sentences in § 5G1.3 indicates that the Commission may have never considered that a defendant would already have completed a sentence for the same conduct underlying his conviction prior to sentencing.  Had they done so, a simple sentence could have been included prohibiting credit for expired sentences.  We find nothing in the text or commentary of the 1987 version of the Guidelines to suggest that the Commission rejected the idea of giving credit for expired sentences.  In fact, we find the opposite.  The commentary to the 1987 version of § 5G1.3 provides that "[d]eparture would be warranted when independent prosecutions produce anomalous results that circumvent or defeat the intent of the guidelines."  USSG § 5G1.3 comment. (1987).  In O'Hagan's case, he had already served his 30 months in state prison and was on state post-release supervision before his federal trial began.  In fact, while the federal indictment was returned within the five-year statute of limitations, it was filed more than four years after the federal offenses had occurred, giving time for the related state prosecution to have substantially run its full course.  We deem it significant that in <u>Blackwell</u> the Sentencing Commission had informed the probation office that a downward departure to account for a discharged sentence was appropriate -- not discouraged, not forbidden, but appropriate.  <u>See</u> <u>Blackwell</u>, 49 F.3d at 1241.  We hold that the district court had the authority to depart downward to give O'Hagan

credit for time served on his expired state sentence.  We affirm the district court's grant of 23 months' credit for this sentence.[11]

We also reject the government's contention that the sentencing court erred by not increasing O'Hagan's offense level by two based on obstruction of justice.  See USSG § 3C1.1 (enhancement applies if defendant "willfully obstructed or impeded ... the administration of justice during the investigation, prosecution, or sentencing of the instant offense").  The government claims O'Hagan gave false and misleading testimony to the SEC during its investigation of his trading in Pillsbury securities.  We hold that the district court did not abuse its discretion in finding that any false or misleading testimony by O'Hagan did not rise to the level required for obstruction of justice.  See United States v. McNeil, 90 F.3d 298, 300 (8th Cir.) (standard of review), cert. denied, 117 S. Ct. 596 (1996).

Our review convinces us that the district court's sentencing guidelines determination of offense level 21 for the grouped fraud counts is correct, and that as a Criminal History Category I offender, O'Hagan's correct guideline range is 37-46 months.  Although O'Hagan's present 41-month sentences on all of the fraud counts are within this range, we must remand for resentencing unless it is clear that the sentencing court would have imposed the same sentence regardless of whether a lower sentencing range would have been available.  United States v. Simpkins, 953 F.2d 443, 446 (8th Cir.) ("If the sentence imposed falls within the guideline range urged by the appellant and if it is clear that the sentencing court would have imposed the same sentence regardless of whether the appellant's argument for a lower guideline range ultimately prevailed, then the matter is not reviewable and will not be remanded for

---

[11]We reject O'Hagan's argument that the district court had to give him credit for the entire 30-month sentence.  It was well within the district court's discretion to grant credit for only 23 of the 30 months served.  See United States v. McNeil, 90 F.3d 298, 300 (8th Cir.) (standard of review), cert. denied 117 S. Ct. 596 (1996).

resencing."), <u>cert. denied</u>, 504 U.S. 928 (1992); <u>see also</u> <u>United States v. Kloor</u>, 961 F.2d 1393, 1394-95 (8th Cir. 1992) (per curium).  Based on our review of the record we cannot say whether or not the district court would have imposed the same 41-month sentences under the presently correct 37-46 month range as it did when the then correct range for sentencing when all 57 counts were before it was 41-51 months.  Thus, we remand to the district court for resentencing within the 37-46 month range.  As explained previously, the district court's grant of 23 months' credit for time served on the state sentence was proper, is affirmed, and may be reapplied in the resentencing proceedings.

## VII.  Conclusion

We have left undisturbed our prior reversal of O'Hagan's money laundering convictions.  We have considered and rejected all of O'Hagan's challenges to his securities fraud and mail fraud convictions.[12]  We have also considered and rejected all of O'Hagan's and the government's challenges to the sentences, but we must remand to the district court to allow resentencing because of our prior reversal of the money laundering convictions.  Accordingly, we affirm O'Hagan's securities fraud and mail fraud convictions, and remand for resentencing consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[12]We summarily reject O'Hagan's claims of prosecutorial misconduct and double jeopardy.